[S.F. 24135. July 13, 1981.]

**JERROLD L. WENGER, a Judge of the Justice Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.**

**COUNSEL**

Mull & Mull and Richard M. Skinner for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and Eddie T. Keller, Deputy Attorneys General, for Respondent.

**OPINION**

**THE COURT\***—The Commission on Judicial Performance unanimously recommends that Justice Court Judge Jerrold L. Wenger of the El Dorado Judicial District, El Dorado County, be removed for "wilful misconduct in office" (hereafter wilful misconduct) and "conduct prejudicial to the administration of justice that brings the judicial office into

---

\*Before Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Newman, J., Kaufman, J.,† and McDaniel, J.†

†Assigned by the Chairperson of the Judicial Council.

disrepute" (hereafter prejudicial conduct) (Cal. Const., art. VI, § 18, subd. (c)).[1] The judge has petitioned this court for review. (Cal. Rules of Court, rule 919(b).)

He was elected on March 4, 1975, took office on March 18, and was reelected for a six-year term beginning January 1977. The commission notified him in March 1978 and again in August that it had received and was investigating statements alleging his misconduct. (See rule 904.) In December 1978 he was served with a notice of formal proceedings (rule 905) that stated 24 charges of misconduct arising out of 13 incidents. In 1979 there were four amended notices, alleging five additional charges of misconduct in three incidents. The original notice was framed in two counts. The first alleged that all the charges constituted wilful misconduct; the second, that all constituted prejudicial conduct. The amended notices added a third count of persistent failure or inability to perform judicial duties.

From October 30 to December 4, 1979, 21 days of hearings were held before a master.[2] He made findings of fact and conclusions of law from the testimony and exhibits, without receiving closing briefs or hearing oral argument from counsel. Exceptions to his report were filed with the commission which, on February 28, 1980, heard oral argument.[3] It then filed here on March 19, 1980, its findings, conclusions, and recommendation of removal.

---

[1]Article VI, section 18, subdivision (c) provides in part: "On recommendation of the Commission on Judicial Performance the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

[2]The master was Sacramento Superior Court Judge Rothwell Mason. Rule 907 provided for his appointment: "Upon the filing of an answer or upon expiration of the time for its filing, the Commission shall order a hearing to be held before it concerning the censure, removal, retirement or private admonishment of the judge, or the Commission may request the Supreme Court to appoint three special masters, or with the consent of the judge involved one special master, in the event that two-thirds of the membership of the Commission vote that this procedure be followed in a specified case, to hear and take evidence in the matter, and to report thereon to the Commission. Special masters shall be judges of courts of record, except that when there are three special masters not more than two of them may be retired judges from courts of record. The Commission shall set a time and place for hearing before itself or before the masters and shall give notice of the hearing by mail to the judge at least 20 days prior to the date set."

[3]Before the master and commission, evidence and argument to sustain the charges were presented by two deputy attorneys general acting as examiners. (See rule 922(f).)

The master's and commission's findings and conclusions are based on count one (wilful misconduct) and count two (prejudicial conduct). Count three (persistent inability or failure to perform) was rejected by the master. The commission explained that the charges in that count "were not reached and are dismissed in view of the Conclusions arrived at in Counts One and Two."

We are concerned only with the charges the commission sustained. (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 784, fn. 5.) They are 14 charges of wilful misconduct and 6 of prejudicial conduct, arising out of 11 incidents. Each was pleaded as an instance of one of five kinds of misconduct: (A) petitioner's improper injection of himself into judicial proceedings, resulting in denial or apparent denial of fair hearing, (B) abuse of contempt power, (C) rude and profane conduct, (D) his improper failure to disqualify himself, and (E) obstruction of a public officer's performance of duty.

■ This court must independently determine from an examination of the record which, if any, of the charges are supported by clear and convincing evidence. Thence we decide whether to adopt, modify, or reject the recommendation of removal. (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 276 [110 Cal.Rptr. 201, 515 P.2d 1].) Generally we give weight to the findings and conclusions of both commission and master. (*Spruance,* 13 Cal.3d at p. 799, fn. 18.) Here, though, their views vary as to factual details and as to application to the facts of grounds for removal. ■ ■■■ For example, several acts the commission treated as wilful misconduct were found by the master to constitute only prejudicial conduct.[4]

---

Here the commission is represented by the Attorney General, acting through those deputies. (See *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 785, fn. 5 [119 Cal.Rptr. 841, 523 P.2d 1209] (explaining commission's dual function as (1) adjudicator in reaching conclusions and recommendations, and (2) adversary in defending those determinations as respondent in this court).)

[4]The distinction between the two grounds is elaborated in *Geiler* and *Spruance*: Prejudicial conduct is deemed less grave than wilful misconduct even though it may on occasion justify removal. (*Geiler,* 10 Cal.3d at p. 284, fn. 11.) Wilful misconduct requires that the judge in a judicial capacity have acted in bad faith; i.e., that he (1) committed acts he knew or should have known to be beyond his power, (2) for a purpose other than faithful discharge of judicial duties. (*Geiler,* 10 Cal.3d at pp. 283-284, 286; *Spruance,* 13 Cal.3d at pp. 795-796.) Bad faith acts not committed in a judicial capacity amount to no more than prejudicial conduct. (*Geiler,* 10 Cal.3d at p. 284, fn. 11.)

Prejudicial conduct must be "conduct prejudicial to the administration of justice *that brings the judicial office into disrepute.*" (Const., art. VI, § 18, subd. (c); italics added.) The italicized words do not require notoriety, but only that the conduct be

In light of that variation we give special weight to the master's resolution of fact issues that turn on the credibility of testimony in his presence. (See *Geiler*, 10 Cal.3d at pp. 275-276.) Yet, even though the commission heard no testimony, its own expertise and unanimity, plus the fact that it and not the master heard posthearing argument, suggest that deference be accorded to its inferences and conclusions.

PETITIONER'S BACKGROUND AND WORKING ENVIRONMENT

Many of the charges sustained involve petitioner's failure to follow proper procedure; e.g., abusing the contempt power and failing to disqualify. His background and working environment are relevant to those charges, and he testified as follows:

After graduating from McGeorge Law School in 1969 he was admitted to practice in 1970. Before then he had been a Sacramento County probation officer. After admission and until his election to the justice court in March 1975 he was a deputy district attorney of El Dorado County. In July 1975 he attended the two-week judge's college sponsored by California Judicial Education and Research (CJER). Subsequently he attended most of CJER's twice-yearly seminar sessions.

His court was on a rural road six miles from the courthouse in Placerville. His in-chambers library contained little more than the third series of California Reports and Appellate Reports (beginning in Oct. 1969), annotated California codes, texts on criminal law and evidence, and several procedure manuals. The Placerville courthouse housed the county law library, two departments of the superior court (Judges Byrne and Fogerty), and the Placerville Justice Court (Judge Hamilton). The Georgetown-Divide Justice Court (Judge Smith) was an estimated 18 to 21 miles away over a "difficult road"; the other justice court was at South Lake Tahoe. As of January 1, 1977, "the jurisdiction of municipal and justice courts is the same and concurrent." (Code Civ. Proc., § 83.)

We turn to the wilful misconduct and prejudicial conduct charges sustained by the commission. They are discussed in connection with the 11 incidents whence they arose, now set forth in chronological order.

---

"damaging to the esteem for the judiciary held by members of the public who observed such conduct." (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 534 [116 Cal.Rptr. 260, 526 P.2d 268].)

RENFRO

In *Renfro* the commission concluded that petitioner committed wilful misconduct by abusing the contempt power and failing to disqualify himself. The master had concluded that both acts constituted prejudicial conduct; whether he found that the failure to disqualify also constituted wilful misconduct is unclear.

Attorney Stephen Keller represented Renfro on a drunk driving charge (Veh. Code, § 23102, subd. (a)). Trial was set for May 5, 1977. On April 29 Keller filed a motion for peremptory disqualification of petitioner (Code Civ. Proc., § 170.6).[5]

The jury trial then was assigned to Judge Hamilton in petitioner's court. Keller phoned Hamilton and said he had to appear that morning in another county and might be late for the trial. Hamilton said he would call the case and, if Keller were late, would decide what to do. Keller arrived at 10:30, and the case was tried.

While waiting for Keller, Hamilton discussed Keller's tardiness with petitioner, who expressed concern that Keller (1) had disqualified him, and (2) claimed an appearance in another county simply to get a continuance of the trial. Petitioner contends that the disqualification was motivated by his having denied Keller such a continuance. But Keller gave good reason for the disqualification: the undisputed fact that at pretrial conference petitioner expressed skepticism of Renfro's version of alcohol consumption in light of the blood report and indicated "the standard fine would be imposed in case of a plea, but if he tries this thing and I think he lied, it'll be a whole lot more." That Keller did request a continuance is supported only by petitioner's uncorroborated testimony; it is not reflected in the court docket. However, the master (but not the commission) found that when Keller informed Hamilton of his probable tardiness he "did not disclose that [petitioner] had refused a request for additional continuance."

Petitioner ascertained from the district attorney's office the circumstances of Keller's arrival at and conduct of the trial. Without

---

[5]A motion to disqualify a judge whose assignment is known 10 days before trial date must be filed at least 5 days before that date. (Code Civ. Proc., § 170.6, subd. (2).) "Peremptory" means that the motion results in disqualification "without any further act or proof." (Code Civ. Proc., § 170.6, subd. (3); see *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 204, fn. 23 [137 Cal.Rptr. 460, 561 P.2d 1148].)

consulting Hamilton, petitioner on May 11 sent Keller a "Notice of Order to Show Cause Hearing" that purported to arise from a case in petitioner's court, "People v. Keller" (unnumbered), and announced a hearing on May 25 at 9 a.m. with no indication of the subject matter.

Petitioner concedes he issued that notice simply as a device to bring Keller in to discuss concerns about *Renfro*, namely Keller's (1) lack of candor about conflicting court appearances in relation to his need for a continuance, (2) failure to disclose petitioner's denial of the continuance request to Judge Hamilton, and (3) tardiness at the trial. The master (but not the commission) accepted petitioner's testimony that he tried to phone Keller before issuing the notice. Keller testified he phoned petitioner in response to the notice; petitioner denied that.

Keller on May 13 filed a motion to disqualify petitioner in *People* v. *Keller* (Code Civ. Proc., § 170.6). Petitioner replied by letter of May 17 that the motion "has been denied" and "a review of contempt procedures is suggested" for the noticed May 25 hearing. Keller, through counsel, on May 23 petitioned the superior court for a stay and writ of prohibition against the hearing. Judge Byrne issued a stay on May 23 and an alternative writ on May 25. Petitioner withdrew the order to show cause, and the writ matter was dismissed as moot.

Petitioner clearly abused the contempt process. That Judge Hamilton had power to treat misrepresentation to obtain a continuance or tardiness at trial as a direct contempt (*In re Ciraolo* (1969) 70 Cal.2d 389, 393 [74 Cal.Rptr. 865, 450 P.2d 241]; *Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 408-409 [42 Cal.Rptr. 441, 398 P.2d 777]; *Vaughn* v. *Municipal Court* (1967) 252 Cal.App.2d 348, 358 [60 Cal.Rptr. 575]) did not confer that power on petitioner. Nor is there evidence of any misrepresentation as to Keller's conflicting obligations in another court.

Both master and commission found that petitioner "was of the belief that his administrative responsibility for controlling the calendar of his court justified his intervention despite the assignment of a visiting judge for the trial." That belief did not justify misuse of the contempt power. ■ We adopt the commission's conclusion that petitioner's "initiation of contempt proceedings against Keller for conduct he speculated to have occurred at the trial presided over by Judge Hamilton, without contacting Judge Hamilton or in any way ascertaining the actual facts, was an abuse of the contempt power and constitutes wilful misconduct in office."

The commission also concluded that failure to disqualify constituted wilful misconduct in that it was "an act which he should have known was beyond his lawful jurisdiction." He testified he denied Keller's motion to disqualify on May 13 because he "concluded that the 170 and 170.6 did not apply to a direct contempt proceeding." In light of *Blodgett* v. *Superior Court* (1930) 210 Cal. 1, 9-15 [290 P. 293, 72 A.L.R. 482], which holds that a judge may not be disqualified under Code of Civil Procedure section 170 from summary contempt proceedings, we dismiss the charge of failure to disqualify.

## Rose v. LePeilbet

Lillian Rose sued her neighbor Leroy LePeilbet for cutting branches of her tree that overhung his land. Petitioner awarded judgment for $45, plus costs, on November 7, 1977. On appeal the superior court ordered judgment for defendant.

The commission sustained three counts of wilful misconduct in a contempt proceeding on July 29, 1977, wherein LePeilbet and Braunstein, his attorney, were charged with refusal to pay the $45 in violation of what petitioner perceived as a stipulation in open court. The three counts sustained were (1) petitioner's improper injection of himself into the proceeding, resulting in denial of fair trial, (2) abuse of contempt power, and (3) failure to disqualify himself. The master had sustained only the first count, finding the acts it charged to be both wilful misconduct and prejudicial conduct. He found that the acts charged in the second count were prejudicial conduct and that the third was not proved.

Rose had filed her complaint on April 22, 1977. A judge other than petitioner issued a temporary restraining order against pruning the tree and an order to show cause. Hearing was held on May 20; the evidence of what happened at the hearing is unclear and disputed. Petitioner overruled LePeilbet's jurisdictional objection based on insufficiency of service. It was established that LePeilbet had completed the pruning before being served with the restraining order. The remaining issue was damages. LePeilbet through Braunstein apparently agreed that the case should be handled as a small-claims matter, authorizing the judge to make an independent investigation (Code Civ. Proc., § 117).

Petitioner understood that LePeilbet also agreed to pay whatever damages the court found, and minutes in the docket reflect that under-

standing. ("Both attorneys agreed to let court appoint a disinterested third party to establish the extent of damage done to the tree. Defendant to pay for damage, if any. Both attorneys stipulated that case subject to reopening at future date if necessary.") LePeilbet and Braunstein, however, each denied admitting liability. Their position from the outset was that LePeilbet had a privilege to prune branches overhanging his land.

Petitioner wrote LePeilbet on June 3 that he had "reviewed the oak tree" with the county agricultural commissioner and concluded that LePeilbet's "self help" caused damage amounting to $45. "Proof of corrective measures must be received by this court by July 1 or this matter will be reopened and an adverse judgment will be rendered on behalf of plaintiff. . . . Once you have met your obligation [for the $45] . . . and I have received proof of such, this matter will be concluded once and for all."

Braunstein's reply on June 15 contained these statements and others in similar vein: "I was shocked by your letter . . . . [T]he matter heard by you was an Order to Show Cause re Preliminary Injunction. It was not a trial of the facts . . . . Your statement that my client must take corrective measures on or before July 1st or face an adverse judgment without benefit of trial, smacks of Star-Chamber, a process I thought abolished in this country. . . . [S]ince you have pre-decided the case, I think you must disqualify yourself from hearing any further proceedings in the matter."

On June 20 petitioner gave notice of a hearing on July 1. Braunstein replied on June 28 that he would be outside California on July 1 and had jury trials set for July 11 and 18, and he requested that the hearing be held no earlier than July 20. Petitioner wrote back that "in view of your position" the hearing would not be continued.

Braunstein on June 22 had moved to disqualify petitioner (Code Civ. Proc., § 170.6). Rose's attorney, Appelbaum, filed an opposing memorandum on June 30, arguing that petitioner's overruling of Braunstein's jurisdictional objection at the May 20 hearing was a ruling on a contested issue that made the disqualification motion untimely.

Only Rose and Appelbaum appeared at the July 1 hearing. Petitioner denied the disqualification motion. He expressed anger at Braunstein's June 15 letter ("Star-Chamber"), which he read aloud. He suggested

that Appelbaum file appropriate affidavits if Rose wished to enforce the May 20 stipulation by contempt proceedings.

On July 7 petitioner issued a notice of "Order to Show Cause hearing regarding a contempt of court" to be held July 29. Declarations of Appelbaum and Rose were attached. The notice cited section 1209.5 of the Code of Civil Procedure but was intended to refer to section 1209, subdivision 5, which provides that disobedience of a court order is contempt. Petitioner regarded LePeilbet's noncompliance with the May 20 stipulation (interpreted as an admission of liability) as contempt under that provision even though no judgment had been entered. His policy in small claims matters was to defer formal judgment, thus relieving voluntarily complying defendants from unnecessary difficulties.

At the July 29 hearing Braunstein denied statements in the Appelbaum and Rose declarations that LePeilbet had agreed at the May 20 hearing to pay damages fixed by the court. Petitioner elicited testimony of the Appelbaum version from his bailiff and clerk, then called LePeilbet to the stand. Braunstein invoked LePeilbet's privilege against self-incrimination. To overcome that objection, petitioner withdrew the contempt charge against LePeilbet. He then asked LePeilbet whether Braunstein had advised him not to comply with petitioner's order (the June 3 letter). Braunstein interposed the attorney-client privilege. Petitioner ordered LePeilbet to answer and denied his request to confer with counsel. Braunstein continued to raise the privilege, and petitioner threatened both with contempt. LePeilbet then testified about Braunstein's advice and other aspects of the case.

Petitioner reprimanded Braunstein for failing to advise his client to pay the damages. The parties then entered into a written stipulation that "the matter is deemed submitted as a motion for summary judgment. Judgment shall not be entered in excess of $45." Though the commission found the stipulation to have been coerced, Braunstein was satisfied with it as a means of obtaining an appealable judgment.

Petitioner testified before the master that he overruled the attorney-client privilege because it "does not apply where advice to violate a law is concerned." He contends here that he relied on Evidence Code section 956 (no privilege if lawyer's services were obtained to aid commission of crime or fraud). The master asked if petitioner saw any distinction between advice to commit a crime and advice on legal tactics to test the sufficiency of a court order in pending litigation. (See *In re*

*Berry* (1968) 68 Cal.2d 137, 148-149 [65 Cal.Rptr. 273, 436 P.2d 273].) Petitioner answered that he "didn't feel there was any pending litigation, other than compliance with the agreement."

Appelbaum on October 7 wrote petitioner that, since no payment had been received, entry of judgment was requested. Petitioner scribbled on Appelbaum's letter: "If JB [Braunstein] wishes another encounter with the Court he need only disregard my instructions one more time." On October 21 petitioner wrote counsel that, since "Mr. Braunstein has failed to comprehend" petitioner's "preference for voluntary compliance in lieu of judgment," judgment was being rendered for plaintiff. From that judgment Braunstein took his successful appeal.

■ Clear and convincing evidence supports the commission's conclusion that at the July 29 hearing petitioner (1) improperly injected himself into the proceeding, and (2) abused his contempt power. As he now concedes, contempt was not a proper remedy to enforce the supposed stipulation to pay damages. His June 3 letter to LePeilbet stated that the alternative to payment would be entry of a judgment. His policy of deferring entry of small-claims judgments against defendants who would comply voluntarily with an informal decision was inapplicable once Braunstein announced LePeilbet's refusal to comply. The policy then became a purported justification for attempting to deprive LePeilbet of the rights of a judgment debtor. Moreover, petitioner wrongfully assumed a prosecutorial role. (*McCartney v. Commission on Judicial Qualifications, supra*, 12 Cal.3d 512, 533.)

Petitioner justifiably was angered by the intemperate language of the June 15 ("Star-Chamber") letter and properly might have taken remedial steps; e.g., by demanding an apology. It appears that instead he sought vindication through misuse of the contempt power. Thus we agree with the commission that petitioner's improper injection of himself into the proceeding and his abuse of the contempt power were wilful misconduct. (See fn. 4, *ante.*)

We agree with the master that the charge of failure to disqualify was not sustained. There was at least enough merit in Appelbaum's opposition to the June 22 motion to make its denial reasonable. The commission argues that petitioner should have disqualified himself once he had become personally embroiled. ■ Personal embroilment may require disqualification to adjudge contempt for disrespect to the court. (*Mayberry v. Pennsylvania* (1971) 400 U.S. 455 [27 L.Ed.2d 532, 91 S.Ct.

499]; *In re Buckley* (1973) 10 Cal.3d 237, 255-257 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].) But the contempt charged here was noncompliance with a direction to pay money, not disrespect; and the refusal to disqualify was not misconduct.

LEE

Petitioner sentenced Lee to spend the weekend of July 22-24, 1977, in jail. A few hours before Lee was supposed to surrender he retained Keller to obtain a stay of execution because of his girl friend's illness. After Keller unsuccessfully attempted to obtain a stay from petitioner and other judges he advised Lee to report to jail.

Lee did not do so and was ordered to appear in petitioner's court the following Wednesday. Keller accompanied him and went into chambers while Lee waited outside. Petitioner questioned Keller about his advice to Lee, particularly whether he had advised Lee not to appear. He questioned Lee on the same subject, found him in contempt, and sentenced him to five days in jail, to commence immediately. After sentencing, petitioner told Keller that if he thought Keller had played any role in Lee's not reporting for jail he would have held Keller in contempt.[6]

While being questioned about his advice to Lee, Keller had no idea that petitioner was considering contempt proceedings. Petitioner made the inquiry because "Mr. Keller had manifest[ed] his inclination in the Renfro matter to manipulate and lie and it was my opinion that he was again manifesting these inclinations." (Letter to commission, Sept. 21, 1978.) Petitioner testified that in *Renfro* he thought Keller had lied to the superior court when he said in his declaration that he had Judge Hamilton's permission to be late for the trial. Petitioner admitted never having asked Hamilton whether that was true.

The commission concluded that petitioner's actions "manifest a disregard of a suspect's rights in contempt proceedings and constitutes wilful misconduct in office." The master had declined to find misconduct in the "mere threat to consider contempt as against Keller."

 The evidence shows more than a "threat to consider" contempt. Petitioner now argues that Keller's advice to Lee was relevant to Lee's

---

[6]According to Keller, petitioner said he would have sentenced Keller to jail on the spot. Petitioner testified he *told* Keller that probably he would have held him in contempt, but *had in mind* only to initiate contempt proceedings.

culpability. Nonetheless the inquiry was aimed principally at Keller, not Lee. Petitioner suspected Keller of a contemptuous act and interrogated him to obtain evidence for a contempt proceeding. If Keller had known the purpose of the interrogation he could have invoked his privilege not to testify. (See *In re Martin* (1977) 71 Cal.App.3d 472, 480 [139 Cal. Rptr. 451].) To attempt to take him unawares was an abuse of the judicial process. We agree with the commission that it constituted wilful misconduct.

## HILL v. MARTIN

On September 30, 1977, Hill sued the Martins in petitioner's court for unlawful detainer of a dwelling. On October 5 the Martins, represented by Appelbaum, filed an answer setting up breach of implied warranty of habitability and enumerating serious defects in the premises. Petitioner reviewed the answer, thought it incredible that anyone would live in a house under the conditions alleged, suspected perjury, and without consulting the parties made inquiries of the county building and health departments.

On October 21 petitioner received a copy of a letter to Hill from a county building inspector listing repairs required on pain of an order to vacate. Those repairs corresponded to some but not all defects alleged in the answer. Petitioner made notes of a call received from a health department employee on October 24. The employee said the house was "not substandard by any stretch of the imagination" but, except to report "water good" and "septic OK," did not expressly contradict the alleged defects.

At a pretrial conference on October 28 petitioner announced his investigation, declared his suspicion that the Martins' allegations were false, and indicated he might hold a hearing on whether they were in contempt. He said that because of the investigation he would disqualify himself from the trial of the merits. That trial was set for November 18.

Later on October 28 he wrote to the building department, enclosing a copy of the Martin answer and requesting "in order to determine whether or not perjury has been committed that one of your inspectors examine this house using the allegations in the answer as special points to check." He asked for a report by November 18. The county replied on November 3 that the building was vacant and would be posted as

hazardous. Petitioner then abandoned the inquiry and telephoned Appelbaum to apologize. On Hill's motion the case was dismissed.[7]

The commission found that petitioner "should have known that it was beyond his lawful authority to conduct an ex parte investigation into allegations of civil pleadings and attempt to transform an ordinary civil case into a contempt proceeding based upon [petitioner's] distorted view that perjury had been committed." It and the master both sustained charges that petitioner committed prejudicial conduct (but not wilful misconduct) by improperly injecting himself into the proceeding and abusing the contempt power.

■ We agree with the finding that petitioner was guilty of prejudicial conduct. By undertaking a collateral investigation he abdicated his responsibility for deciding the parties' dispute on pleadings and evidence properly brought before him. However, we sustain only the charge of improperly injecting himself into a proceeding and not the charge of abusing the contempt power. ■ It is not misconduct for a judge to initiate contempt proceedings after hearing a case in which properly presented evidence indicated probably deliberate falsity in a verified pleading. (See *People* v. *Agnew* (1947) 77 Cal.App.2d 748 [176 P.2d 724] (perjury in verified pleading).) Petitioner's mistake was abandoning his adjudicative role for an investigatory one.

## ALDRICH

In *Aldrich* the commission held that petitioner committed wilful misconduct by attempting to dissuade an inexperienced attorney from representing Robert Aldrich, whom petitioner had jailed for contempt, and that petitioner committed prejudicial conduct in commenting to the press about the superior court ruling setting aside his contempt order and telling the attorney that Aldrich was a "puke" and "psychopath."

On January 11, 1978, petitioner sentenced Aldrich to 24 hours in jail for contempt based on courtroom conduct. John Olson, who petitioner

---

[7]Both commission and master found that petitioner was less than forthright in describing this incident in correspondence with the commission. We discern no fraudulent intent in these admitted misstatements in his letter of September 21, 1978: (1) He did not inquire of the county until after the pretrial conference. (The inquiry preceded the conference.) (2) The building department's letters sent to petitioner support the conclusion that Martin attempted deception in the verified answer. (The letters were attached to petitioner's letter as exhibits and spoke for themselves.)

knew was a newly admitted attorney, was retained to represent Aldrich. He petitioned the superior court for habeas corpus and obtained an order to show cause that he served on petitioner in chambers on January 12. No one else was present. Petitioner told Olson that Aldrich was a "puke" and a "psychopath" and that there was no defense to the contempt order. He also said Olson should not be representing Aldrich and urged Olson to talk with experienced local attorneys who assertedly would advise him against getting involved in the case. Olson said he would consider the suggestions.

On January 18, preparing for the habeas hearing, Olson visited petitioner's court to examine the docket. They discussed the case for half an hour. Petitioner again tried to dissuade Olson from representing "that puke" (Aldrich) and had his clerk tell Olson of the events that led to the contempt order. Olson replied that the clerk's version was consistent with his own information but that he thought it was not a proper contempt case. Petitioner attacked Aldrich's "criminal background" and said that if Olson remained in the case he could never again practice before petitioner and probably not in western El Dorado County. He added that Olson's office associates also might have difficulties in practicing in his court. Olson asked what would happen if he did withdraw; petitioner replied that there would then be no problem.

Olson left the conversation confused and upset. He consulted his associates; they advised him not to withdraw. One of them, Mark Nielsen, who had known petitioner since 1971, phoned him that evening, hoping he would reconsider. To Nielsen's dismay, petitioner reiterated what he had told Olson who, petitioner added, had been duped by the scheme of Aldrich (the "puke") to embarrass petitioner's court. Though Olson did not withdraw from the case, neither he nor his colleagues experienced adverse consequences in later appearances before petitioner.

As a deputy district attorney petitioner had assisted in successfully prosecuting Aldrich for armed robbery and arson. According to the testimony of Judge Smith, Aldrich had a community reputation as a hoodlum and describing him as a "puke" was not unfair.

Between petitioner's two conversations with Olson, Aldrich harassed petitioner. He repeatedly drove past petitioner's home. When petitioner and his wife and bailiff went to lunch in a crowded restaurant, Aldrich and a friend continually hovered by petitioner's table, causing petitioner's party to leave. Petitioner obtained a shotgun and installed lights

outside his house. A psychiatrist who examined petitioner on November 10 and 18, 1979, testified on November 20 that Aldrich's activities created a "stress reaction" that caused petitioner's outbursts to Olson and Neilsen on January 18, 1978.

At the habeas proceeding on January 20 petitioner appeared in propria persona. After hearing evidence Judge Fogerty explained from the bench his reasons for granting the writ. He began by describing the extreme caution with which the summary contempt power should be exercised. He opined that Aldrich had been jailed simply for accepting a bailiff's invitation to express an opinion.[8] He concluded:

"There have been serious efforts made in California to improve the qualities of the lower courts, and people with professional training are put in those positions and they are supposed to use that professional position to exercise restraint that permits an efficient administration of justice. [¶] It is not a chamber of terror, or it is not a place people should be frightened to go; and when they are asked for an opinion, they should be able to express it. What might be loud and belligerent language to someone might simply be a heated expression of an opinion of another. All of those who have been in the cauldron of the courtroom know that the expression of opinion sometimes is loud and emphatic language. [¶] It is wrong to put people in jail whether it is by the process of contempt or any other ex parte proceeding, except in extraordinary circumstances."

Finally, petitioner's request to reply in open court to Judge Fogerty's statement from the bench was denied. Immediately after the hearing, petitioner was interviewed by a reporter. A local newspaper published the Fogerty statement, followed by this concededly accurate account of what petitioner said:

"'It is unfortunate that the judge has taken the position he has,' said Wenger. [']Superior court judges sit in an insulated environment buffered from direct public contact by the attorneys who represent them.

---

[8]The opinion was stated as follows: "I don't understand how in the world a bailiff can involve himself in court proceedings and create a situation where an individual is asked to express an opinion, which, if the evidence is true, and it is not contradicted, that the judge called the preceding litigant an ass, and when asked to express an opinion, the individual does so and then finds himself in jail. [¶] Had he approached the judge and called him an ass without provocation, or had he approached the judge in some fashion and engaged in insulting conduct, that would be one thing."

We in the justice courts are not as fortunate, since we maintain a toe-to-toe contact with the public and are therefore exposed to a much greater dilemma than upper levels. [¶] In the instance of my court, removed from the center of activity, completely unprotected, without media contact, without means of relief should a dangerous situation arise it is incumbent that the judge have the ability to control the conduct of those who may appear before him. [¶] 'The instant case is very typical of many that confront justice court judges each day,' Wenger continued. 'Many persons from distant metropolitan areas are required to appear for assorted violations, and many of them manifest a contemptuous and disrespectful attitude to not only law enforcement but likewise the courts where they must appear. To divest justice court judges of the dignity and ability to control this potentially explosive environment is to strip away the underlying foundations originally built into these courts. [¶] It's unfortunate for the law-abiding populace that are required to share the same quarters with dissidents and those who would wilfully disrupt the court proceedings. [¶] It is tragic that the courts which are designed and intended for the man on the street must be turned into an arena for those dissidents who have no respect for the law or consideration for others. [¶] This decision undoubtedly undermines the entire judicial structure on the lower levels, the people's courts." A result of the news story was a rift between Judge Fogerty and petitioner that ended their informal communications on professional matters.

Of the three *Aldrich* charges sustained by the commission we begin with those found to be only prejudicial conduct. The tasteless use of "puke" and "psychopath" to describe Aldrich to Olson and Nielsen does not warrant discipline for "rude and profane conduct." The words were not uttered from the bench but in one-to-one conversation in chambers or on the telephone. The effect differed little from a describing of Aldrich as a "hoodlum" or an "unsavory character."

As for petitioner's statement to the press, he correctly points out that his making it did not violate the command of canon 3(A)(6) of the Code of Judicial Conduct to "abstain from public comment about a pending or impending proceeding in any court." The contempt litigation had been concluded.

The canon states that it "does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court." An ethics opinion that

petitioner introduced states that "nothing in the Code of Judicial Conduct prevents a judge from making a dignified response to public criticism except as related to a case pending or about to be brought before the court." (Conference of Cal. Judges, Com. on Judicial Ethics, Opn. No. 24, Mar. 27, 1976.)

Was petitioner's statement to the press, however, more than "a dignified response to public criticism?" He did not merely recount a justice court's need of power to control unruly conduct while defending his contempt order as a proper exercise of that power. He declared: "To divest justice court judges of the dignity and ability to control this potentially explosive environment is to strip away the underlying foundations originally built into these courts. . . . This decision undoubtedly undermines the entire judicial structure on the lower levels, the people's courts."

Those words did misrepresent Judge Fogerty's ruling, which was narrowly based on a finding that the bailiff had invited Aldrich's conduct. (See fn. 8, *ante*.) But was petitioner's statement "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (Cal. Const., art. VI, § 18, subd. (c))? In the circumstances, we think not (Cf. *United States* v. *Morgan* (1941) 313 U.S. 409, 421 [85 L.Ed. 1429, 1435, 61 S.Ct. 999], *re* "a practice familiar in the long history of Anglo-American litigation, whereby unsuccessful litigants and lawyers give vent to their disappointment in tavern or press") and dismiss the charge.

■ There remains the commission's determination of wilful misconduct in attempting to dissuade Olson from representing Aldrich. It is elementary that a judge "must be on his guard neither to infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar." (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 559 [68 Cal.Rptr. 1, 440 P.2d 65] (trial court held without power to remove counsel as incompetent).) "*Smith* makes it abundantly clear that the involuntary removal of any attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed." (*Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697 [122 Cal.Rptr. 778, 537 P.2d 898].) Petitioner does not claim to have questioned Olson's competence.

Petitioner's "stress reaction" from Aldrich's harassment does not excuse his conduct. (Cf. *In re Fahey* (1973) 8 Cal.3d 842, 850, fn. 4 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465] (attorney misconduct).) He does not contend that his January 12 talk with Olson reflected the stress reaction. He argues that his attempts in that conversation to convince Olson that Aldrich's case was meritless and that Olson should not handle it were not improper because petitioner then was simply "a party to the [superior court] lawsuit, not a judge who was to decide anything further." The argument is specious; his position was that of judge attempting to discourage the exercise of rights to obtain review of his contempt order. His statements to Olson and Nielsen on January 12 and 18, 1978, constituted wilful misconduct in office.

## KELLY

In *Kelly* the commission concluded that petitioner committed wilful misconduct by failing to disqualify himself but dismissed charges of abusing the contempt power as "not sustained." Petitioner contends that the misconduct found was different from that charged in the notice of formal proceedings, which alleged: "In *People* v. *Kelly*, Docket No. 79645, attorney Roger Cline, on or about April 20, 1978, filed a motion disqualifying you under Code of Civil Procedure section 170.6. On or about April 21, 1978, you notified Mr. Cline that the motion for disqualification was denied as to arraignment; arraignment then proceeded as scheduled. [¶] On May 10, 1978, Cline and the defendant appeared for the pretrial conference. In chambers, you indicated to Cline that you had forgotten about the disqualification, and following some discussion, you told Cline he was disrespectful and unprofessional. Cline then briefly left chambers to confer with his client. Cline returned to your chambers and further discussion ensued. [¶] On or about May 11, 1978, Case No. 79645, you notified Cline to appear on May 15, 1978, for summary contempt proceedings. [¶] On May 15, 1978, purporting to act pursuant to Penal Code section 166, and over objection by Cline's attorney, you found Cline in contempt of court, imposed a $300 fine, and, unless Cline apologized, you banned him from all future appearances in your court except trials. When Cline indicated an unwillingness to pay the fine, you sentenced him to jail until the fine was paid; upon request, execution was stayed. A written order was filed on May 16, 1978, and assigned case No. 7681."

Petitioner's answer admitted the first three paragraphs of those allegations. As to the fourth, it was admitted that he found Cline in

"summary contempt," fined him $300 and, on his refusal to pay, sentenced him to jail until the fine was paid. Also admitted were the stay and written order.

The commission concluded: "[Petitioner] sought to read implied withdrawal of disqualifications in the actions of attorneys obeying his specific orders, and he attempted to find an abuse of the disqualification process by questioning the good faith of the affiant. These were acts which he should have known were beyond his lawful power. They accordingly constituted wilful misconduct in office."

The conclusion was based on this evidence: Notifying Cline on April 21 that the disqualification motion was denied as to arraignment, petitioner wrote: "Inasmuch as an arraignment does not involve a contested issue of law or fact, it will be necessary for Mr. Kelly to appear in person, or by counsel at the arraignment [on April 25]." Cline's associate, Brunello, represented Kelly at the arraignment. At the May 15 contempt hearing against Cline petitioner said: "Mr. Brunello made no objection to the [pretrial] date setting, knowing that I would be the presiding judge, nor did he indicate that Mr. Cline would take over the case and would wish to pursue this disqualification as previously referred to. In other words, there was no reference whatsoever to lead me to believe that I would not be acceptable to sit on this case at future hearings."

Later in the hearing he declared, "[T]his is an example of an abuse of the disqualification process permitted under section 170.6. ... Mr. Cline is alleging that I might be prejudiced against the interests of his client, the defendant, and believes that the defendant cannot receive a fair trial. I do not know Mr. Kelly."

When Cline's attorney, Olson, pointed out that the ground for disqualification was that "defendant would be denied a fair hearing because of prejudice against the attorney," petitioner replied, "I have no prejudice."

In *Cannon v. Commission on Judicial Qualifications, supra*, 14 Cal.3d 678, 696, this court refused to adopt the commission's conclusion of wilful misconduct consisting of "unwarranted interference in the operation of the Public Defenders' Office" because the judge had been "charged only with an unlawful interference with the attorney-client relationship." Similarly here, the conclusion of misconduct based on

questionable statements about the effect of the disqualification motion was beyond the scope of the notice of formal proceedings. Accordingly the charge is dismissed.

## ELLIS

In *Ellis* the commission concluded that petitioner committed (1) wilful misconduct in abusing the contempt power by invoking it to enforce an order he made after being disqualified (Code Civ. Proc., § 170.6), and (2) prejudicial conduct in deciding contested issues after the disqualification. The master concluded that failure to disqualify was wilful misconduct but that petitioner's only abuse of the contempt power was negligent failure to follow correct procedures, amounting to prejudicial conduct.

Ellis, represented by Keller, was arraigned on burglary charges before petitioner on October 6, 1978. He pleaded not guilty, and preliminary hearing was set for October 16. Immediately after arraignment Keller, against whom petitioner had sought to exercise the contempt power in *Renfro* and *Lee*, filed a section 170.6 motion to disqualify petitioner. Petitioner instructed his clerk to arrange for Judge Smith to sit at the preliminary hearing. The *Ellis* charges relate to the scheduling of that hearing.[9]

Judge Smith returned from vacation on October 16. Petitioner's clerk called him at 9 a.m.; he said he could conduct the hearing on either October 19 (a.m.) or October 20 (p.m.). They agreed on October 19. The clerk called Keller's office; his secretary said that on October 19 he had an all day engagement in the San Francisco area. The clerk said Keller should appear in court at 11 a.m. that day (Oct. 16) and take the matter up with petitioner.

At Keller's direction his secretary then called Judge Smith and asked if the hearing could be held on a day other than October 19. Smith said October 20 was better for him anyway and asked the secretary to call petitioner's court and set the hearing for October 20. About 9:30 the

---

[9]Keller complained to the commission on May 3, 1978, about petitioner's conduct in *Renfro* and *Lee*. Petitioner contends that animosity against him made Keller deliberately disruptive, and he continually interprets Keller's conduct in that light. For example, he argues that Keller deliberately refrained from informing him of the planned disqualification motion during the arraignment, when petitioner could have taken it into account in scheduling the preliminary hearing.

secretary told petitioner's clerk that Keller's office had been in touch with Judge Smith and that he had set the hearing for October 20. The clerk again replied that Keller should take up the matter in court that morning (October 16).

At 11:15 Keller was in court, and petitioner opened the proceeding by scolding Keller for not giving notice of the section 170.6 disqualification at the time of arraignment. He then stated he understood Judge Smith would be available at 9 a.m. on the 19th. Keller said his office had been in touch with Smith who, Keller understood, "would be available at 1:30 on Friday" (the 20th). Petitioner replied that Keller's office "is in touch with far too many judges" such as Hamilton (an apparent reference to *Renfro*) and now Smith, "who has no standing in this case until such time that he is arranged for and confirmed by this court." He charged Keller with "twist[ing] the procedures" and asked if Keller was "prepared at this time to file a formal time waiver so that the matter may go over to the 19th for Judge Smith." Keller said he had not prepared a written waiver but would file one; petitioner demanded it before noon.

He then launched into a long lecture, excoriating Keller for disrespect, manipulation, and dishonesty, and for filing a disqualification while knowing that "it is extremely difficult to find a substitute judge." He refused Keller's request to respond,[10] finally told him to leave, and ordered Ellis back at 9 a.m. on the 19th for a preliminary hearing at which Judge Smith would preside.

Petitioner contends his setting the hearing for October 19 was justified by Keller's failure to disclose his calendar conflict. The commission found that Keller had no opportunity to do so, and the finding is supported by testimony of the deputy district attorney and the transcript. The master did not decide the point. In any event, petitioner's clerk acknowledged being informed of the conflict more than an hour before the hearing.

On the 17th Smith had conversations with both Keller and petitioner that left him with the impression that the hearing would be held on the 20th. On the 18th petitioner informed Smith that, because of the num-

[10]Petitioner said: "I have heard all I want to hear. I know you disagree with me, and you can run back to the Council on Judicial Performance again. I think you have already been exposed to Council by a full realization of how you conduct yourself as a so-called attorney."

ber of witnesses subpoenaed and the inconvenience to all parties, he would prefer that the hearing be held the next morning. Later, Keller called Smith to say he still could not make it on the 19th. Smith told Keller to send Ellis to court so that Smith could take a waiver of time for the purpose of continuing the case.

On the 19th Smith was in petitioner's chambers, prepared to don his robe, call the case, take a waiver of counsel and of right to speedy preliminary hearing, and continue the case. He was "a little dumbfounded" when petitioner took the bench instead. The transcript shows that petitioner interrogated his clerk, Ellis, Judge Smith, and the district attorney at length about the scheduling of the hearing and particularly any communications with Keller about his absence. Petitioner then turned to the purportedly unlimited waiver of time for preliminary hearing that Ellis, through Keller, had filed on the 16th. Petitioner construed that waiver as effective only until the 19th and ordered a hearing on the 23d to "establish whether the time waiver will be forthcoming or whether we'll have to dismiss the complaint and refile and proceed with the arraignment again." He told Judge Smith he need not be present on the 23d.

Fearful of being jailed if he appeared before petitioner, Keller presented a petition to Superior Court Judge Byrne, who declined to issue a writ but telephoned petitioner.

On October 23, in place of Keller, Stambaugh appeared before petitioner as counsel for Ellis. Petitioner asked him if he were prepared to file a waiver. Stambaugh said his and Keller's position was that the previously filed waiver was sufficient and, since the court disagreed, asked for a hearing on that issue before another judge, petitioner having been disqualified. Petitioner suggested that since the basis of disqualification was his prejudice against Keller, not Ellis, "we can now proceed to determine the question of fact." Stambaugh replied that in associating with Keller he joined all Keller's prior positions. Petitioner then ordered that the complaint be dismissed and that, on Ellis' rearrest on a new complaint, he be released on his own recognizance. Concededly the basis of that order was a ruling that the previously filed waiver was invalid. The hearing was markedly prolonged by petitioner's tirades against Keller and his "senseless manipulation."

Keller wrote petitioner on October 24 that he was "shocked and surprised" by the dismissal, which he considered void in view of petitioner's disqualification.

On November 6 petitioner sent Keller an order to show cause re contempt, to be heard November 13. Attached was petitioner's affidavit grounding the contempt charge on Keller's failure to appear on October 19. Petitioner declared: "That at no time during the proceedings on October 16th, or during the interim period of time between October 16th and October 19th, did Attorney Keller protest the date set for the preliminary hearing." Yet the October 19 transcript reports Judge Smith as stating that between the 16th and the 19th he had had two or three contacts with Keller, who said he could not attend on the 19th because of a calendar conflict and whom Smith then instructed to have Ellis appear on the 19th anyway, so that Smith could "get a time waiver."

Judge Fogerty issued an alternative writ of prohibition against the contempt hearing.[11] The writ proceeding was terminated by a settlement providing for (1) dismissal of contempt charges against Keller and (in *Anderson*) Cline, and (2) procedures enabling Keller and Cline to obtain on request a transfer of any matter in which they were attorneys from petitioner's courtroom to that of Judge Hamilton in Placerville.

Testifying before the master, petitioner said his reason for citing Keller for contempt was disobedience of petitioner's "order not to engage in calendaring with a judge that had no involvement with the court." Failure to appear on October 19 (the only ground given in the contempt affidavit) was just "the end result." Asked when he made such an order, petitioner pointed only to his statement at the October 16 proceeding that Keller's office "is in touch with far too many judges who have no particular standing in this case" such as Judges Hamilton and Smith.

The commission founded its conclusion of wilful misconduct for abuse of the contempt power on two grounds: (1) error "in ordering the matter heard by himself almost a month after the event," and (2) error "in an attempt to use the contempt power to enforce an order entered by him in a case where he had been disqualified and the judge assigned to hear the matter was present in the courtroom on the date of the hearing but was prevented by [petitioner] from taking the bench."

The first ground is insufficient. Petitioner does appear to have been "personally embroiled" enough to have been required to recuse himself. (*Mayberry* v. *Pennsylvania, supra,* 400 U.S. 455, 465 [27 L.Ed.2d 532, 540]; *In re Martin* (1977) 71 Cal.App.3d 472, 480 [139 Cal.Rptr.

---

[11]Petitioner effected a section 170.6 disqualification of Judge Fogerty.

451].) Yet, there is no clear and convincing evidence that he intended to hear the contempt matter himself rather than calling in another judge.

 The second ground of wilful abuse must be sustained. Keller's reason for absence on October 19 had been fully explained to Judge Smith. It was proper for Keller to deal directly with Smith in making scheduling arrangements, which both understood to be subject to the availability of petitioner's courtroom and to the convenience of other counsel, parties, and witnesses. The contempt charge appears to have been made because of petitioner's animosity toward Keller rather than his good faith perception of any contemptuous conduct. Making it was wilful misconduct.

The commission found prejudicial conduct in petitioner's "action in continuing to preside and to decide contested issues in a case where a 170.6 disqualification had been filed." Petitioner must have known and now admits that he had no power to decide the validity of Ellis's time waiver. The charge is sustained.

STERN

In *Stern* the commission found wilful misconduct in petitioner's alteration of the date of an "Affidavit in Support of Hearing on Contempt" and prejudicial conduct in issuance of a no-bail arrest warrant unsupported by either a criminal complaint or a contempt affidavit. The master sustained both charges only as prejudicial conduct.

On October 25, 1978, Gary Stern appeared in petitioner's court on traffic infractions. He made remarks that petitioner deemed offensive. Petitioner partially dealt with Stern's case and then, according to petitioner, instructed Stern to remain until the end of the calendar. Stern testified he felt free to leave. During a recess Stern departed, taking with him the court docket on his case.

Petitioner immediately issued an arrest warrant, servable at night, citing the traffic offenses and also misdemeanors under Penal Code sections 166 (contempt) and 488 (theft). The warrant specified "no bail" and was on a form that stated, "A verified complaint was made before me on this day that the offense set forth above was committed." Apart from the traffic infractions, no complaint had been filed.

On October 26 Stern consulted Keller. Next day petitioner received in the mail from Stern the stolen docket, a letter making a "formal apology . . . as ordered by you," and a check for $10, the original bail set on the citation. On November 3d Stern was arrested on the warrant; Keller filed for habeas corpus in superior court; and Stern was released on his own recognizance. Petitioner was served with that petition no later than November 6.

On November 7 the clerk typed, and petitioner signed, an "Affidavit in Support of Hearing on Contempt" in *Stern*, reciting that Stern had appeared on petitioner's traffic arraignment calendar on October 25, made disruptive remarks, stolen the docket, and departed contrary to court order. Also recited was receipt on October 27 of Stern's letter and check and the stolen docket.

The clerk first typed on the affidavit the current date, November 7. On petitioner's direction, she whited that out and inserted October 27. Petitioner's only explanation of the change is that October 27 was when he started the rough draft.

The commission described the date change as "alteration" of a document. Yet editing the draft was not alteration since the document was then unsigned and thus incomplete. The change is better described as "backdating."

The commission argues that petitioner changed the date to bolster his position in the habeas proceeding. Keller's clerk had examined the *Stern* file in petitioner's court on November 1 and ascertained the absence of any affidavit concerning contempt. At the habeas hearing on December 4 petitioner unhesitatingly admitted, under Keller's cross-examination, that the affidavit was typed November 7 and changed to the date of the rough draft.

Petitioner argues that backdating to October 27 would not cure the absence of documentary support for the October 25 arrest warrant. But the affidavit's reference to events of October 27 would have been inconsistent with any earlier backdating.

We agree with the master that petitioner's motivation for backdating the affidavit is not clear. It was, though, done deliberately; and petitioner knew or should have known that it would create a false impression that he had signed on the earlier date. We infer that whatever

petitioner's purpose it was not the faithful discharge of judicial duties. Backdating the affidavit was wilful misconduct.

■ We agree with the commission that issuance of the no-bail arrest warrant without the filing of a criminal complaint or initiation of a contempt proceeding (Code Civ. Proc., §§ 1211, 1211.5) was prejudicial conduct. Though conceding error, petitioner urges that he believed in good faith that he was acting within his summary contempt power. That consideration may have led the commission to refrain from finding wilful misconduct; it does not preclude our finding prejudicial conduct. (See fn. 4, *ante.*)

## ANDERSON

In *Anderson* the commission concluded that petitioner "did wilfully abuse his contempt power." The nature of the abuse is implicit in findings on petitioner's (1) order of December 4, 1978, reciting five grounds of contempt by Attorney Cline, and (2) intent to preside at the contempt hearing despite admitted prejudice against Cline. Charges of failure to disqualify were dismissed. The master concluded that petitioner (1) wilfully abused the contempt power as to one of the grounds stated in his order, and (2) wilfully failed to disqualify himself.

A bench warrant was issued against Anderson for failing to appear in petitioner's court for arraignment on a charge of possessing a controlled substance. Cline, as Anderson's counsel, called petitioner on November 7, 1978, to ask for release of Anderson on his own recognizance (OR). Petitioner said he would consider OR release only after talking with Anderson in court. Cline consulted Attorney Keller and decided to disqualify petitioner (Code Civ. Proc., § 170.6). He then called Judge Smith, who said he was sitting in petitioner's court that afternoon and would meet Cline and Anderson there at 3 to consider OR or bail reduction.

At 3 p.m. Cline arrived at petitioner's court, filed the disqualification, and waited outside until Anderson arrived at 3:30. He took Anderson inside and met petitioner, Smith, and two attorneys emerging from chambers. Cline explained he was there to make an OR motion for Anderson. Petitioner said he could not consider it unless the disqualification were withdrawn. Cline suggested Judge Smith handle the matter. Petitioner asserted his authority in that courthouse, saying that Smith

was not to hear anything and was just leaving. Smith departed; neither he nor Cline informed petitioner of their arrangement.

Cline asked petitioner to consider the OR request. Petitioner said he would do so only if Cline withdrew the disqualification. Referring to *Kelly*, petitioner said Cline was not welcome in petitioner's court until he offered an apology. Cline became impatient and aggressive; the confrontation was heated. Finally, petitioner remanded Anderson into custody. Cline departed and obtained an OR order from Judge Fogerty that afternoon.[12]

On November 15 petitioner set Anderson's arraignment for November 28. Cline wrote petitioner's clerk on November 21, inquiring when the matter would be assigned to another judge and saying that, because petitioner had banned him from the court, he would not appear until such reassignment. On the 28th petitioner had his clerk advise Cline's office that one of Cline's associates (but not Cline) must appear with Anderson that morning for arraignment. No one appeared. Later that morning Cline called Sprunger, the county counsel, and suggested that the arraignment be put over so that Cline could talk with his client and a substitute attorney. Sprunger called petitioner, who reset the arraignment for the 30th.

Still later on the 28th, Cline called both Sprunger and petitioner and stated he would not appear for the arraignment until another judge was assigned. Petitioner made no attempt to obtain another judge. His position, stated to Cline then and earlier (see *Kelly*), was that he was authorized to hear an arraignment despite disqualification under section 170.6.[13]

---

[12]Petitioner testified that, if he had been informed of the Cline-Smith arrangement, he would have let Smith hear the matter. Smith testified that he had no "chance to work it into the conversation." Further, that petitioner said, "Judge Smith is leaving, aren't you, Judge Smith, and I, rather than raise a stink, I said sure, I'm leaving, and left."

Cline had good reason for not disclosing the arrangement himself. He had just talked with Keller and inferably knew that only three weeks earlier, in *Ellis*, petitioner had berated Keller in open court for communicating directly with Smith on the scheduling of a hearing in petitioner's court for which petitioner had been disqualified. The master, however, found that "Cline's tactics that day, including secreting from [petitioner] the arrangements he had made with Judge Smith, manifested his intention to escalate the tenseness of the situation." Cline had complained about petitioner by letter to the commission on April 14, 1978.

[13]Petitioner reasonably points out that the orderly way to test his position would have been to apply to the superior court for a writ ordering him to refrain from hearing the

On December 1, petitioner served Cline with an "Order Adjudging Direct Contempt of Court" that stated five grounds of contempt based on attached affidavits and set a hearing for December 11. On December 8, Cline petitioned the superior court for mandate. On advice of the county counsel petitioner's order of December 1 was set aside on December 18 and replaced the same day by a similar order issued by a judge assigned from another county. The mandate and contempt proceedings both were dismissed on January 18, 1979, under the settlement that also concluded *Ellis*.

We see no misconduct in petitioner's including the first, third, fourth, and fifth grounds in his contempt order. The first was that during the November 7 confrontation Cline "address[ed] the court in a disorderly, insolent, hostile and disrespectful manner." Bystanders' testimony provides enough support for that ground to establish that its truth was a proper question of fact. ■ The third, fourth, and fifth grounds were based on Cline's nonappearances at the scheduled November 28 and 30 arraignment hearings. There is no contention that those grounds would have been improper in the absence of Cline's disqualification of petitioner under section 170.6, and the commission dismissed the *Anderson* charges of petitioner's failure to disqualify as "not sustained." Petitioner's position that (1) the disqualification did not cover arraignments, and (2) Cline should contest it by superior court writ proceeding was not so meritless as to amount to misconduct. (See fn. 13, *ante*.)

■ The second-stated ground of contempt was that Cline violated his duty to his client and that as a result the client was denied a hearing and incarcerated. Petitioner's supporting affidavit indicated that the alleged violation occurred during the confrontation of November 7. Yet the affidavit omitted Judge Smith from its enumeration of persons present. It is undisputed that Smith was then authorized to hear cases in petitioner's court.[14] Petitioner's refusal to consider the OR request un-

arraignment. He contended that an arraignment hearing remained within his power because section 170.6 disqualifies a judge only from trying a case or hearing "any matter therein which involves a contested issue of law or fact." That view had at least enough merit to prevent the holding of it from constituting misconduct. (See *Mezzetti* v. *Superior Court* (1979) 94 Cal.App.3d 987 [156 Cal.Rptr. 802] (disqualified judge held authorized to hold settlement conference); *Fraijo* v. *Superior Court* (1973) 34 Cal. App.3d 222 [109 Cal.Rptr. 909] (plea bargain). But see *In re Byron B.* (1979) 98 Cal. App.3d 300 [159 Cal.Rptr. 430] (acceptance of juvenile's admission of guilt); *Lyons* v. *Superior Court* (1977) 73 Cal.App.3d 625, 627 [140 Cal.Rptr. 826] (plea bargain).)

[14]It was stipulated that an order of the Chairperson of the Judicial Council then in effect provided that a judge of any justice court was authorized to sit in any other justice court "under an exchange assignment as defined by Rule 790, California Rules of

less Cline withdrew the disqualification impliedly asserted the disqualification's validity. The denial of an OR hearing and subsequent incarceration resulted from petitioner's refusal to honor Cline's request that the matter be heard by Smith, not from Cline's refusal to withdraw the disqualification. To charge Cline with contempt for a consequence for which petitioner himself was responsible constituted wilful misconduct.

Petitioner concedes that, though prejudiced against Cline, he intended to preside at the hearing ordered for December 11, erroneously believing that contempt law permitted him to do so. The order seems to have conveyed that intent.[15] Its issuance therefore was prejudicial conduct, somewhat mitigated by petitioner's correcting the error when finally another judge was substituted on December 18.

### BROOKS

The commission concluded that in *Brooks* petitioner committed wilful misconduct by abusing the contempt power and failing to disqualify himself. The master found prejudicial conduct in abusing the contempt power, no more.

On October 27, 1978, Brooks was charged with two misdemeanors and an infraction under the Vehicle Code. Section 40517 provides that a person required to appear on such charges "before a justice court judge who is not at the county seat ... may demand a transfer of the case to a ... judge ... having jurisdiction of the offense at the county seat upon filing with such justice court judge an affidavit that he believes that a fair trial without excessive penalties cannot be had before such justice court judge. ... [¶] Thereupon the justice court judge with whom the affidavit is filed shall be without jurisdiction to proceed with the case and shall immediately transfer the case ...."

---

Court" without prior approval of the Administrative Office of the Courts. In petitioner's deposition of January 11, 1979, taken in the *Cline* contempt matter, he testified that "Judge Smith is more or less obligated through his agreement with the Board of Supervisors to cover vacancies in the three other judicial districts, that being mine, the Placerville, and Lake Valley."

[15]After declaring the five grounds petitioner's order continued, "for which conduct I did then and there, and do now, adjudge said Roger F. Cline guilty of contempt of court, and I hereby order that said Roger F. Cline appear before this court on December 11, 1978 at 2:00 o'clock P.M. to show cause why he should not be punished for contempt as hereinabove stated."

On advice of Attorney Keller and pursuant to statute Brooks executed a declaration under penalty of perjury that included the statement, "I believe that I cannot obtain a fair trial without excessive penalties in the above entitled court." In recommending that declaration Keller (then involved in *Ellis* and *Stern*) explained he was having personality conflicts with petitioner.

The declaration and accompanying motion were filed at Brooks' arraignment on November 14. Under questioning by petitioner, Brooks stated he had never met and did not know petitioner and had executed the declaration on his attorney's advice. Petitioner ordered a November 21 hearing on the motion, for which he requested points and authorities on the statute's applicability.

At that hearing petitioner accused Keller of filing a false declaration ("impugning and maligning the integrity of this court and myself as judge") by inducing Brooks to swear he could not obtain a fair trial without excessive penalties. Petitioner charged that Keller thereby committed a direct contempt of court and invited an explanation. Keller objected that (1) he had received no notice of the contempt charge, and (2) the charge should be heard before another judge. He readily conceded that Brooks' declared belief of inability to obtain a fair trial before petitioner had been formed because Keller "persuaded him to believe it."

After berating Keller, petitioner declared him in contempt and sentenced him to five days in jail beginning on November 24 (the 23d being Thanksgiving). Finally he asked, "Do you have anything further, Mr. Keller?" Keller said, "Yes, what is your ruling on the motion for change of venue?" Petitioner replied, "Oh, I have no objection to that; in fact, I welcome it."

Keller through Attorney Cline filed for a writ of certiorari with the superior court which, on November 22, stayed Keller's sentence. At the December 6 hearing on the writ petitioner appeared through County Counsel Sprunger. At the end of the hearing Judge Fogerty "without hesitation" granted the writ from the bench and said he was "appalled by these proceedings."

█ Petitioner did abuse the contempt power. The genuineness of Brooks' belief that petitioner would not give him a fair trial was consistent with its being based wholly on information about strained relations

between petitioner and Keller. Petitioner knew or should have known that Keller's advice to Brooks was proper. The contempt order and jail sentence appear motivated by personal animosity; rendering them was wilful misconduct.

The charge of failure to disqualify is dismissed. Brooks' case was duly transferred. Petitioner would have been entitled to deal with the filing in his court of a false affidavit before that transfer as a direct contempt. (*In re Ciraolo, supra*, 70 Cal.2d 389, 393.) His position that such a contempt proceeding need not be transferred to another judge was sufficiently plausible to preclude a finding of misconduct based on lack of transfer. (See *id.* at p. 392; *In re Buckley, supra*, 10 Cal.3d 237, 256.)

## DISNEY

The commission concluded that petitioner committed wilful misconduct in banishing Prosecutor Susan Disney from his court, thus limiting the district attorney's options in making personnel assignments. The master had reached a similar conclusion.

Disney was assigned to the court on being employed as a deputy in the fall of 1978. She criticized petitioner's handling of the *Rogers* matter that October. They had a strained discussion of the incident but made efforts to get along and by March 1979 had developed a workable relation.

In March petitioner was served with the commission's first amended notice of formal proceedings; it charged misconduct in *Rogers*. (The charge was later rejected by the master and dismissed by the commission.) Petitioner believed Disney was the source of the charge. He told District Attorney Tepper that he felt betrayed and would prefer that Disney not be assigned to his court.

In April 1979 Disney was present in Judge Hamilton's court during proceedings in the *May* case, which had been transferred from petitioner's court. When May expressed dissatisfaction at petitioner's handling of the case Hamilton told May how to communicate with the commission. On April 17 petitioner was served with the commission's second amended notice charging misconduct in *May*. (That charge also was rejected by the master and dismissed by the commission.) Petitioner assumed Disney had steered May to the commission and again com-

plained to Tepper. On learning that May's source of information was Hamilton, petitioner apologized to Tepper and Disney.

Petitioner had no further contact with Disney until July 11, when Tepper assigned her two cases in petitioner's court. Petitioner had no advance notice of the assignment. When she arrived he called her into chambers, criticized her complaining to the commission in *Rogers*, and told her she was not welcome in his court and was to leave. She asked about her cases; he said they would be handled in normal course. He refused her request to set out in the docket that she was forbidden to appear.

In fact the defendants never appeared, and bench warrants were issued. There is no evidence, however, that Disney was informed during the conversation that their nonappearance was the reason the cases would not proceed.

Petitioner called Tepper and tried to arrange a discussion of differences. Tepper testified, however, that petitioner's condition for resolution was "that he expected some apologies and that he expected that she wouldn't be involved in communicating incidents to third parties about the operation of his court." Tepper also stated he told petitioner that to have one of two deputies barred from petitioner's court "did create some problems for us." At the time of the hearings before the master Disney had not returned to petitioner's court.

Petitioner argues that he properly disclosed his bias to enable Tepper to protect the People's right to an impartial judge. But what effect the disclosure might have on assignment of deputy district attorneys was for Tepper, not petitioner, to decide.

Petitioner also contends his conduct was equivalent to recusing himself for possible prejudice. Recusal, though, would require assigning cases to another judge; petitioner retained the cases and barred a particular prosecutor from his court.

Petitioner's apparent purpose in excluding Disney was to prevent her reporting his conduct to the commission. He claims his principal concern was that she did not consult him before reporting. Consultation was not required; its absence did not justify the ban from his court, which we conclude was wilful misconduct.

Petitioner contends he was denied due process because the misconduct found by the commission varied materially from that charged. The commission concluded: "The effect of preventing Disney from performing her official duties, banishing her from his court, limited the District Attorney's options in making personnel assignments and thus did obstruct a public officer from performing official duties to that extent. This constituted wilful misconduct in office."

That conclusion was based on this allegation in the third amended notice: "You have willfully and unlawfully resisted, delayed and obstructed a public officer in the discharge or attempt to discharge the duties of his office in that on or about July 11, 1979, you refused, for improper personal reasons, to allow Susan Disney, a duly appointed deputy District Attorney of El Dorado County, to appear in the Justice Court, El Dorado Judicial District, on matters duly and lawfully assigned to her."

Petitioner argues that the charge (1) was not sustained because Disney's appearance on July 11 was thwarted not by his excluding her but by defendants' nonappearance, and (2) omitted the commission's conclusion that the effect of the exclusion was to limit the district attorney's personnel assignment options.

The notice may be reasonably understood to charge obstruction of the district attorney by not permitting his deputy to appear. Even if understood to refer only to obstruction of Disney, the allegation of interfering with her "attempt" to discharge official duties was proved. Further, there was interference with her actual performance of duty to ascertain and report back why the cases assigned to her did not proceed.

Petitioner argues that if he had known the commission's proposed conclusion he could have elicited evidence on the extent to which his conduct limited Tepper's "options in making personnel assignments." Proof of a lesser administrative burden would not have excused petitioner's acts. He was not denied due process.

## CONCLUSION

Petitioner's conduct warrants discipline, and our choice is between removal (the commission's unanimous recommendation) and censure.

Addressing above the eleven incidents, we sustain charges of wilful misconduct in nine and prejudicial conduct in another. The charge in the remaining incident (*Kelly*) is dismissed because the commission's conclusion was procedurally defective.

██ The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing "lack of temperament and ability to perform judicial functions in an even-handed manner." (*Cannon v. Commission on Judicial Qualifications, supra,* 14 Cal.3d 678, 705, 707.) These patterns emerge:

Instead of honoring peremptory disqualifications of himself petitioner intruded into matters that had become another judge's responsibility (*Renfro, Ellis, Anderson*) and denounced the disqualification as an affront (*Ellis, Brooks*). When annoyed by a party's conduct he groundlessly pried into counsel's advice (*Rose v. LePeilbet, Lee, Brooks*) or attempted to dissuade counsel from representing the party (*Aldrich*). He interfered with law practice by threatening or purporting to exclude attorneys from his courtroom (*Aldrich, Anderson, Disney*) or sentencing the attorney to jail for appropriate advice to the client (*Brooks*). He overstepped limits on his power to resolve civil disputes by attempting to punish nonobedience to his informal directions as a contempt (*Rose v. LePeilbet*) and unilaterally investigating facts (*Hill v. Martin*). He disregarded or violated contempt procedural rules. (*Lee, Stern, Anderson.*)

There is no evidence that he neglected his work or used his office for illicit gain. As the master observed, "his fault lay more in his overzealous performance of his duties." Petitioner candidly admitted he had a "bull headed approach" and was "more concerned about substantiating my contentions in a matter than being correct."

By way of mitigation he contends he was a target of obstreperous and manipulative conduct and complains of a conspiracy between Keller and Cline to remove him from the bench. The misbehavior he confronted was manageable. Keller's and Cline's consultations, pointed to as conspiratorial, appear to be only exchanges of information on common problems.

Petitioner also contends that he was inexperienced and has learned not to repeat his mistakes. His five years as a deputy district attorney in

the same county should have acquainted him with criminal procedures. He had the benefit of continuing education through CJER. His abuses in the civil matters (*Rose* v. *LePeilbet* and *Hill* v. *Martin*) were too serious to be explainable by inexperience.

His final testimony before the master was laudably contrite. He had come to understand the truth of Judge Fogerty's remarks in *Aldrich* that contempt should be used with the greatest of discretion and temperance. At last he saw that the reasons for his making and repeating many mistakes lay in himself and in "that part of my personality that has blinded me to the realization that I'm not right. I've striven to support my position without realizing that there is more to it."

The difficulty with his professed enlightenment is its delayed arrival. He reacted to the commission's initial letter of March 1978 not by reconsidering his position but only with rationalizations and excuses. The second letter reached him in August; yet *Ellis, Stern, Anderson*, and *Brooks* occurred that fall, *Disney* the following spring and summer. Even while preparing for the master's hearing he "couldn't really get a realization" of his problems. It was only during the hearing itself, probably "when one of the witnesses referred to my general demeanor as egotistical," that the light began to dawn.

Mitigation of wrongdoing requires more than an unfulfilled intent to reform. A justice court judge has weighty responsibilities. (*Spruance* v. *Commission on Judicial Qualifications, supra*, 13 Cal.3d 778, 802 (reviewing role of municipal court judge); Code Civ. Proc., § 83 (municipal and justice court jurisdiction the same).) The aim of commission proceedings is not punishment but "to protect the judicial system and the public which it serves from judges who are unfit to hold office." (*McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9 [138 Cal.Rptr. 459, 564 P.2d 1].) Faithfulness to that aim requires removal here.

We order that Judge Jerrold L. Wenger of the Justice Court of the El Dorado Judicial District be removed from office. Since the misconduct for which he is removed did not amount to grounds for disbarment, he shall, if otherwise qualified, be permitted to practice law. (Cal. Const., art. VI, § 18, subd. (d); see *Geiler* v. *Commission on Judicial*

*Qualifications, supra*, 10 Cal.3d 270, 287; *Spruance* v. *Commission on Judicial Qualifications, supra*, 13 Cal.3d 778, 803, fn. 21.) This order is effective upon the finality of this decision.