*CJP Supp. 259 Opinion
HORN, Chairperson.
I.
INTRODUCTION AND PROCEDURAL HISTORY
This disciplinary matter concerns Judge Robert G. Spitzer, a judge of the Riverside County Superior Court. He was appointed to the municipal court in 1990 and became a superior court judge in 1998. The notice of formal proceedings, filed July 31, 2006, charges Judge Spitzer with eight counts of judicial misconduct.
Count I charges Judge Spitzer with backdating orders and failing to dispose of matters promptly and efficiently.
Count II charges Judge Spitzer with failing to decide matters that were under submission for decision for over 90 days and executing false salary affidavits in four cases.
Count HI charges Judge Spitzer with failing to take action on pending matters in two cases.
*CJP Supp. 260 Count IV charges Judge Spitzer with failing to timely decide matters submitted to him for decision in two cases.
Count V charges Judge Spitzer with improperly initiating an ex parte communication with a prosecution witness in a criminal case, considering information he obtained during the ex parte communication in dismissing the case, and making comments in open court reflecting bias against the prosecution witness.
Count VI charges Judge Spitzer with initiating an ex parte communication with a potential witness in a criminal case, improperly investigating the facts of the case, and arranging for the witness to give sworn testimony over the telephone, reflecting embroilment and bias.
Count VII charges Judge Spitzer with putting pressure on the district attorney’s office to charge the defendant in a murder case with manslaughter, engaging in an ex parte communication with the decedent’s mother in an attempt to persuade her to ask the district attorney’s office to agree to a manslaughter plea, and suggesting to the decedent’s family that the case would be dismissed if the jury was not able to reach a verdict on the murder charge after a retrial.
Count VIII charges Judge Spitzer with failing to cooperate with the commission during its preliminary investigation as required by law.
A panel of three special masters appointed by the California Supreme Court heard evidence in this disciplinary proceeding, made factual findings and issued their conclusions of law. The masters are the Hon. Fred K. Morrison, Associate Justice of the Court of Appeal, Third Appellate District, the Hon. Mary Jo Levinger, Judge of the Superior Court of Santa Clara County, and the Hon. Mark H. Tansil, Judge of the Superior Court of Sonoma County. The masters held an evidentiary hearing and filed a report with the commission on April 16, 2007. Judge Spitzer made an oral argument before the commission on August 29, 2007. Judge Spitzer is represented in this proceeding by Reginald A. Vitek and Heather L. Rosing of San Diego. The examiners for the commission are Andrew Blum and Bradford L. Battson.
The masters found the charges were proven by clear and convincing evidence, except for the charge in count I that Judge Spitzer backdated orders. Our review of the record leads us to the same conclusion. We adopt most of the masters’ factual findings. We reach our own independent legal conclusions, which at times diverge from those of the masters. For reasons set forth in this decision, we conclude that Judge Spitzer engaged in willful misconduct by signing false salary affidavits with an utter disregard for the *CJP Supp. 261 truth in two cases charged in count II, and through his embroilment and ex parte communications in two criminal cases charged in counts V and VII. With regard to the remaining proven charges, we conclude Judge Spitzer engaged in prejudicial misconduct. In addition, we conclude Judge Spitzer persistently failed to perform his judicial duties through his derelict practices which resulted in inexplicable delays and in some cases a complete failure to decide matters assigned to him, and by his failure to abide by his obligation to cooperate with the commission.
A judge may be removed from office for prejudicial misconduct, willful misconduct, or persistent failure to perform judicial duties. (Cal. Const., art. VI, § 18, subd. (b).) Judge Spitzer has engaged in a course of conduct over a significant period of time within each of these categories. The pattern of misconduct before us involving inexcusable delays, failure to act, and gross neglect of court orders demonstrates an unwillingness or inability to perform judicial functions which are essential to the fair and efficient administration of justice. Judge Spitzer also has engaged in willful misconduct involving the execution of false salary affidavits, embroilment, and ex parte communications which is fundamentally at odds with the integrity and restraint expected of the judiciary. Further, the lack of candor and accountability manifested by Judge Spitzer in these proceedings raises substantial concerns regarding his suitability to remain on the bench. For these and other reasons expressed in this decision, we order Judge Spitzer removed from office.
n.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
The factual findings we make are adopted for the most part from those of the special masters, which we have determined are supported by clear and convincing evidence and worthy of deference. When necessary to our decision, we have made additional factual findings shown by clear and convincing evidence based on our review of the record. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman); Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].)
A. Count I—Backdating and Delay
1. Findings of Fact and Conclusions of Law Concerning Backdating
Count I charges Judge Spitzer with delay in deciding matters and backdating orders to make it appear as if they had been decided in a timely fashion. *CJP Supp. 262 In each of the four cases charged, the order was given to the clerk for filing and entering into the computer (“processing”) months after the date next to the judge’s signature. Judge Spitzer testified to a practice of signing orders and placing them somewhere in his cluttered chambers or courtroom rather than giving them to his clerk to be processed. The masters found “[i]t is credible that if Judge Spitzer signed an order and did not put it out for processing it could get lost in chambers that by all accounts were extremely disorganized.” As such, the masters concluded that there was not clear and convincing evidence of backdating.
We agree with the masters that the evidence of backdating does not meet the burden of proof by which commission proceedings are governed. The examiner has the burden of proving the charges by clear and convincing evidence. Clear and convincing evidence is “ ‘ “ ‘so clear as to leave no substantial doubt’; ‘sufficiently strong to command the unhesitating assent of every reasonable mind.’ ” ’ ” (Broadman, supra, 18 Cal.4th at p. 1090, quoting In re Angelia P. (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) The evidence must establish a “high probability” the charge is true, but need not prove the charge beyond a reasonable doubt. (Broadman, at p. 1090.)
Numerous witnesses, including Justice Douglas Miller, the former presiding judge,[1] and Tonia Dealer, Judge Spitzer’s longtime courtroom clerk, testified that the judge’s courtroom and chambers were in shambles. Files and loose documents were strewn about without any discemable organization. As a result, court records were routinely lost or misplaced.
Sometime between 2001 and 2002, the presiding judge was informed that Judge Spitzer was not taking care of routine matters in a timely fashion. As a result, routine matters that should have been assigned to Judge Spitzer had to be spread out among the other judges.
Missing documents and daily inquiries from attorneys and litigants regarding the status of cases pending before Judge Spitzer prompted the supervising judge to direct the court services director to conduct a housecleaning or inventory of the judge’s courtroom and chambers. At least two inventories took place in late 2002 and early 2003, with Judge Spitzer’s consent.
The masters found that Judge Spitzer has been “plagued” by organizational issues since “the beginning of his career in the district attorney’s office.” Based on the uncontested evidence supporting this finding and the complete *CJP Supp. 263 state of disarray in the judge’s courtroom and chambers, we concur with the masters that it is plausible signed orders were misplaced. Nevertheless, we do not consider Judge Spitzer’s chronic state of disorganization and gross neglect of court records to be mitigating in any sense. While his dysfunctional practices may raise substantial doubts regarding backdating, as we discuss later in relation to the appropriate discipline, these practices raise serious concerns regarding his fitness to hold judicial office.
2. Findings of Fact Concerning Delays
The masters found Judge Spitzer’s “practice of signing orders and not sending them to be entered and processed is inexplicable and amounts to a dereliction of duty . . . .” We agree.
In each of the four cases charged in count I, Judge Spitzer admitted significant delays in giving signed orders to his clerk for processing. The periods of delay were as follows:
1. Count IA (Hubbard v. Madia). The orders were dated August 30, 2002, but not processed until February 2003.
2. Count IB (City of Moreno Valley v. Southern Cal. Assn, of Governments (SCAG)). The judgment and writ were dated July 3, 2003, and file stamped July 7, 2003, but not processed until June 2004. SCAG’s appeal, filed August 16, 2004, was dismissed as untimely because over thirteen months had elapsed since the “entry of judgment.”
3. Count I C (California Casualty Insurance v. Methany (CCI)). The order was dated December 31, 2003, but not processed until June 2004.
4. Count I D (Sharp v. Betelli, S.P.A.). The order was dated May 10, 2004, but not processed until June 2004.
During the periods of delay in the last three cases, Judge Spitzer failed to cooperate with his presiding judge’s repeated inquiries regarding the status of the cases and directives to resolve all outstanding matters. In early June, Judge Spitzer received an e-mail from Judge Miller informing him his paycheck would be withheld because the Sharp matter had been under submission for over 90 days. Within days of receiving this e-mail, the matters in count I B through D were processed.
Judge Spitzer suggested the Sharp matter (count I D) had not been timely processed because his clerk, Ms. Bealer, was on vacation and matters had piled up at her workstation while she was gone. The testimony of Ms. Bealer *CJP Supp. 264 and her replacement clerk refutes this claim. Judge Spitzer testified that the signed document in the CCI matter (count I C) sat on Ms. Bealer’s workstation for months waiting to be processed. However, Ms. Bealer testified that she kept up-to-date in processing documents because she did not have enough work to do during that time.
3. Conclusions of Law Concerning Delay
We conclude that these delays constitute a violation of the judge’s duty (1) to dispose of matters promptly and efficiently (Cal. Code Jud. Ethics, canon 3B(8); all references to a canon are to the California Code of Judicial Ethics), (2) to uphold the integrity of the judiciary (canon 1), and (3) to act in a manner that promotes public confidence in the judiciary (canon 2A). The masters concluded, as do we, Judge Spitzer engaged in prejudicial misconduct, and persistently failed to perform judicial duties in each of the four cases charged.
Prejudicial misconduct is “ ‘ “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” ’ ” (Broadman, supra, 18 Cal.4th at p. 1092.) Judge Spitzer’s imprudent and inexcusable delays prejudiced parties and were detrimental to the fair, orderly, and efficient administration of the court. SCAG’s" appeal was dismissed as untimely as a result of the judge’s delay in processing the judgment. By allowing judicial orders to sit unprocessed in his cluttered chambers for months, Judge Spitzer showed a complete indifference to the rights of litigants and his judicial responsibilities. Limited court resources had to be expended conducting inventories of his courtroom and files searching for missing documents, responding to persistent complaints from attorneys and litigants, and corresponding with Judge Spitzer concerning his overdue cases.
Moreover, we agree with the masters that the delays in this and subsequent counts were aggravated by Judge Spitzer’s failure to cooperate with his presiding judge. Judges have a duty to “cooperate with other judges and court officials in the administration of court business.” (Canon 3C(1); see also canon 3C(3) [presiding judges have duty to ensure the prompt disposition of matters before judges they supervise].) Rather than cooperating with his presiding judge, who made repeated attempts to get Judge Spitzer to resolve delayed matters, Judge Spitzer resented being “micro-managed.” As a result, in the words of the masters, “Judge Spitzer became passive-aggressive and actually ignored some of the directions he received from Judge Miller (for example, an order to not start a new trial until all overdue matters were decided) .... The failure to cooperate with the presiding judge was foolish and unhelpful, since the presiding judge was seeking to assist him.”
*CJP Supp. 265 These delays, when combined with similar derelict conduct in counts II through IV and count VIH, constitute a persistent failure to perform judicial duties. Persistent nonperformance of duties, an independent ground for removal, “entails a pattern of legal or administrative omissions or inadequacies in the performance of a judge’s duties.” (Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 312 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan); see McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 197 [260 Cal.Rptr. 557, 776 P.2d 259] [judge delayed signing judgment for six years].) The evidence clearly and convincingly establishes such a pattern.
B. Count II—Delay and False Salary Affidavits
In the four cases included in this count, Judge Spitzer is charged with delaying decisions and signing salary affidavits falsely declaring he had no causes pending and undecided that had been under submission for more than 90 days. Under California law, judges are expected to decide matters submitted to them within 90 days of submission, and are prohibited from receiving their salaries during times when they have undecided matters under submission for more than 90 days. (Cal. Const., art. VI, § 19; Mardikian v. Commission on Judicial Performance (1985) 40 Cal.3d 473, 477, fn. 4 [220 Cal.Rptr. 833, 709 P.2d 852].) To be paid, the judge must sign an affidavit to that effect. (Gov. Code, § 68210.)
1. Findings of Fact
As all judges are required to do, Judge Spitzer signed monthly affidavits declaring that he had no matters pending for more than 90 days after submission prior to receiving his paycheck.[2] The masters found that Judge Spitzer delayed making decisions for more than 90 days after submission in each case charged in count H and signed erroneous salary affidavits during those delayed periods.
Judge Spitzer denied ever knowingly signing false salary affidavits. The masters found the evidence did not clearly and convincingly prove Judge Spitzer knowingly signed false salary affidavits. We defer to this finding. (See Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 878 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher) [“special weight” given to the special masters’ factual determinations]; Inquiry Concerning Freedman (2007) *CJP Supp. 266 No. 179, Decision and Order Imposing Public Censure, p. 20 [49 Cal.4th CJP Supp. 223, 243] {Freedman).) However, as we discuss in relation to our legal conclusions, we reach our own determination that Judge Spitzer signed false salary affidavits with a reckless disregard for the truth in those instances where the evidence clearly and convincingly proves he continued to execute salary affidavits after being informed he had delayed matters[3] pending. (See Fletcher, supra, at p. 878 [commission has “expertise” with regard to legal conclusions].)
We make the following findings as to each case charged in count II, which are for the most part adopted from the masters’ factual findings and are supported by clear and convincing evidence.
Count IIA—McGuire v. L.M. Jones Roofing (McGuire)
On June 21, 1996, Judge Spitzer presided over a small claims trial de novo and took the matter under submission. Judge Spitzer testified he made a decision sometime in 1996, but did not sign an order. The masters rejected this testimony, finding clear and convincing evidence Judge Spitzer failed “to timely decide the McGuire matter for nearly six years, after inquiry from the parties and the plaintiff’s family . . . .” We concur in this finding.
A few weeks after the trial, the plaintiff, Timothy McGuire, contacted Judge Spitzer’s clerk and was told the file was missing. Mr. McGuire’s wife contacted the court clerk numerous times after the trial and was told there was no ruling. Stella Provencio, Judge Spitzer’s clerk from 1996 until 2001, received complaints from parties, and gave the messages to Judge Spitzer who had no response. The register of actions shows a call from the defendant on April 4, 2001, inquiring about the decision.
By Judge Spitzer’s own account, he became aware a decision was never issued when he received a communication from the clerk’s office regarding an inquiry from a party and again when the plaintiff’s mother, who was a prospective juror, told him her son had not received a decision. These contacts were in 2001 and early 2002.
On May 17, 2002, Judge Spitzer conducted a second de novo trial and rendered a decision in favor of the plaintiff.
Judge Spitzer signed 39 false salary affidavits between August 1998 and April 2002 when the McGuire matter had been under submission for over 90 days and a decision had not been rendered.
*CJP Supp. 267 Count IIB—Pownall v. American City Mortgage Corp.
On July 30, 2001, Judge Spitzer heard the plaintiff’s discovery motion which was under submission as of August 15, 2001. Judge Spitzer never issued a ruling on the discovery motion. The case was settled on December 21, 2001, and dismissed on January 22, 2002. Judge Spitzer signed a false salary affidavit on December 11, 2001, while the motion was pending for over 90 days.
Count II C—Lindsay v. City of Riverside (Lindsay)
The plaintiff’s motion to tax or strike costs (objection to the defendant’s request for costs) was submitted to Judge Spitzer on May 21, 2003. Judge Spitzer never ruled on the motion.
In July 2005, the commission sent Judge Spitzer a letter stating he “never issued a ruling on the plaintiff’s Motion to Tax Costs and Fees” in this case. After receiving that letter, Judge Spitzer still did not resolve the matter and continued to sign salary affidavits.
Judge Spitzer signed false salary affidavits between September 2003, when the matter had been under submission for more than 90 days, and July 2006, when the notice of formal proceeding was filed, with the exception of February 2004.
Count IID—Cervantes v. Riverside Community Hosp.
In March 2004, Judge Spitzer took the defense discovery motion under submission. Judge Spitzer never ruled on the motion but continued to sign salary affidavits after the matter had been under submission for over 90 days.[4]
We defer to the masters’ finding that Judge Spitzer “mistakenly thought Cervantes was not his case” after he was transferred to a criminal assignment on June 11, 2004. However, we question the reasonableness of this “mistake.” As an experienced judge he should have been aware that a matter remains his to decide once it is under submission to him regardless of his present assignment, unless specifically told the matter has been assigned to another judge. Moreover, the presiding judge informed Judge Spitzer when he was transferred to criminal that he was to continue to work on those civil matters that were under submission.
*CJP Supp. 268 2. Conclusions of Law

False Salary Affidavits

We conclude Judge Spitzer engaged in willful misconduct when he signed false salary affidavits after having been informed that he had delayed matters in the McGuire (count II A) and Lindsay matters (count II C), and engaged in prejudicial misconduct in executing the remaining false salary affidavits as charged in count II.
Willful misconduct, the most serious form of judicial misconduct, consists of (1) unjudicial conduct (2) that is committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).)
Failure to comply with the California Code of Judicial Ethics is generally considered to constitute unjudicial conduct. (Dodds, supra, 12 Cal.4th at p. 172.) By signing false salary affidavits, Judge Spitzer violated his duty to comply with the law and act in a manner that upholds the integrity of the judiciary (canons 1, 2A).
The “bad faith” requirement for willful misconduct is satisfied when a judge is “(1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.) The Supreme Court has described “conscious disregard” in this context as follows: “Because transgressing the limits of a judge’s lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge’s reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly characterized as bad faith.” (Ibid.)
In our recent decision censuring Judge Freedman, we concluded the judge acted with an utter and reckless disregard for the truth when he continued to sign salary affidavits after being informed that he had delayed matters pending and without deciding the matters. In those instances, we determined he engaged in willful misconduct. (Freedman, supra, No. 179 at p. 21 [49 Cal.4th CJP Supp. at p. 244].) Applying this same standard to the *CJP Supp. 269 present case, we conclude Judge Spitzer engaged in willful misconduct by executing false salary affidavits in the McGuire (count II A) and Lindsay matters (count II C).
Judge Spitzer acknowledged he had been informed in 2001 and early 2002 that a decision had not been issued in the McGuire matter. Nevertheless, he failed to rule on the matter until May 2002 and continued to execute salary affidavits stating he had no delayed matters under submission.
In the Lindsay matter, Judge Spitzer testified he thought he mled on the matter. However, in July 2005 he was expressly told in a letter from the commission that the plaintiff’s motion to tax costs was undecided. At that point, Judge Spitzer’s persistence in signing salary affidavits without even looking into whether the matter had been resolved constituted a reckless indifference to the truth.[5] We reject the judge’s argument he did not have to decide the plaintiff’s motion to tax costs because the case was concluded. The plaintiff was entitled to resolution of the motion regarding reimbursement of court costs and fees even if other issues in the case had been resolved.
There is not clear and convincing evidence that Judge Spitzer executed other false salary affidavits charged in count II in bad faith. In those instances, we conclude that Judge Spitzer engaged in prejudicial misconduct by failing to ensure he did not have delayed matters pending before executing his salary affidavits. Judge Spitzer had no reliable system for keeping track of cases under submission. In determining that Judge Freedman engaged in prejudicial misconduct by executing false salary affidavits even when there was not clear and convincing evidence of bad faith, we stated: “A judge who executes a salary affidavit affirming he or she has no overdue rulings should take care to ensure that the statement is true when it is made. There is no question Judge Freedman knew the law, for he signed the state and county affidavits for the express purpose of receiving his salary. It is unjudicial and damaging to the public esteem for judicial office for a judge to submit false statements to obtain salary to which the judge is not then entitled.” (Freedman, supra, No. 179 at p. 24 [49 Cal.4th CJP Supp. at p. 246].)
Judge Spitzer has similarly compromised public confidence in the judiciary by executing erroneous salary affidavits without ensuring their truthfiilness.

Delays

Judge Spitzer’s failure to promptly decide the matters charged in count II constitutes prejudicial misconduct, separate and in addition to the *CJP Supp. 270 misconduct associated with executing false salary affidavits. In the McGuire matter, he failed to rule for six years, and in the other three matters he never issued a ruling. These failures constitute a violation of the judge’s duty to promptly and efficiently hear and decide all matters assigned to him (canons 3B(1), 3B(8)) and to act in a manner that promotes and preserves the integrity of the judiciary (canons 1 & 2A). Litigants and the public have a right to expect judges to take action on matters assigned to them in an expeditious and efficient manner. A judge’s failure to act deprives litigants of resolution of their disputes and grievances through the court system. Litigants who are not represented by counsel, as is the case in all small claims actions, are especially vulnerable when a judge fails to take prompt action in their cases. This is particularly true when the judge fails to respond to litigants’ inquiries concerning the status of their cases, as occurred in the McGuire matter.
The masters concluded that the failure to promptly rule on submitted matters in count II constitutes prejudicial misconduct and a persistent failure to perform judicial duties, and we adopt these conclusions as our own. (In re McCullough (1987) 43 Cal.3d 534, 535 [236 Cal.Rptr. 151, 734 P.2d 987]; In re Creede (1986) 42 Cal.3d 1098, 1099 [233 Cal.Rptr. 1, 729 P.2d 79] [“protracted delays served to damage the esteem of the public for the judiciary . . .”]; Mardikian v. Commission on Judicial Performance, supra, 40 Cal.3d at pp. 482, 485; see also Freedman, supra, No. 179 at p. 17 [49 Cal.4th CJP Supp. at pp. 240-241].)
C. Counts III and IV—Delay and Inaction
1. Findings of Fact
In count III, Judge Spitzer is charged with failing to take necessary action in two civil cases. In Robinson v. Brighton Lake Hills Associates (count III A), a construction defects case, the parties submitted proposed case management orders in April 2003. Judge Spitzer conducted a case management conference in June 2003 but failed to issue a case management order. As the masters explain, a case management order in a construction defects case is “mandatory” and “important”; it “can help organize such complex, expensive litigation, facilitating the parties’ consideration of alternative dispute resolution, and orchestrating streamlined, economical trial preparation.”
In Portofino Development, L.P. v. Van Daele Development Corp. (count III B), Judge Spitzer failed to issue orders on the defendants’ motions for summary judgment filed in April 2003 despite reminders from counsel. The masters accurately described motions for summary judgment as “a significant aspect of civil litigation,” which need to be promptly ruled on “[i]n order for civil litigants to efficiently litigate or resolve their cases.”
*CJP Supp. 271 In count IV, Judge Spitzer is charged with failing to timely decide two matters. In a criminal case, People v. Gorton (count IV A), the defendant filed a request with Judge Spitzer for a certificate of probable cause in March 2002. The defendant, who had pled guilty and was sentenced by Judge Spitzer, was required to obtain this certificate in order to appeal certain issues in his case. (Cal. Rules of Court, rule 8.304(b).) Judge Spitzer was aware of the requirement that he act on the request within 20 days. Nevertheless, he did not rule on the request until directed to do so by the supervising judge of the criminal division almost 10 months later.
In Horst v. Del Webb Corp. (count IV B), Judge Spitzer took a matter involving an order to show cause under submission on April 11, 2003. He did not issue an order until four months later after receiving an e-mail inquiry concerning the case from the presiding judge. Judge Spitzer testified he prepared the order in his computer in June 2003, at which point he thought the matter was no longer under submission. We adopt the masters’ finding that “[rjegardless whether Judge Spitzer believed that typing an order and leaving it in the computer was equivalent to making a decision in a submitted matter, this case was not decided until August 11, 2003.”
2. Conclusions of Law
In each of the cases charged in counts III and IV, the masters concluded Judge Spitzer engaged in prejudicial misconduct and a persistent failure to perform judicial duties. We concur. By failing to take action on the matters in count III, Judge Spitzer violated his duty to decide “all matters assigned to him,” in violation of canon 3B(1). His inaction in count HI and his delays in deciding the matters in count IV, also constitute a violation of his duty pursuant to canon 3B(8) to dispose of all matters promptly and efficiently. Moreover, Judge Spitzer failed to act in a manner which promotes the integrity of the judiciary in violation of canons 1 and 2A.
In the cases included in these counts, as in the delayed cases in counts I and II, Judge Spitzer gave little consideration to the interests of litigants whose matters had been under submission for prolonged periods of time. The criminal defendant in Gorton had to wait 10 months while incarcerated to determine whether he could appeal certain issues in his case as a result of Judge Spitzer’s delay. Inexcusable judicial delay and inaction undermine public confidence in the judiciary, and, as such, constitute prejudicial misconduct. (In re McCullough, supra, 43 Cal.3d at p. 535.) The evidence clearly and convincingly establishes a continuing pattern of persistent failure to perform judicial duties (in conjunction with counts I and II). (See ibid.)
*CJP Supp. 272 D. Count V—Ex Parte Communication and Embroilment (People v. Johnson)
1. Findings of Fact
During the criminal trial in People v. Johnson, Judge Spitzer became suspicious that the deputy district attorney (DDA) did not have all his witnesses for the trial, including the arresting officer, Deputy Villalobos. Based on that suspicion, on the evening of September 8, 1999, the judge called the watch commander where Deputy Villalobos worked and was told the deputy was on medical leave.
The next afternoon, Deputy Villalobos, the only remaining witness, was not present. Judge Spitzer granted the defense motion to dismiss the case. He took the information he received from the watch commander into consideration, but did not inform either counsel or the defendant of the ex parte communication.
In dismissing the case, Judge Spitzer commented: “It’s not been without cost to Mr. Villalobos who, if he had a measure of credibility in the court, now walks into the court with a certain negative impression which will not be confined to this courtroom, but to every courtroom in western Riverside County.” Judge Spitzer seemed upset and annoyed when he made this comment and refused to let the DDA address the court on the issue.
Later that day, the DDA and his supervisor, Chief DDA Soccio, went to Judge Spitzer’s chambers and asked the judge why he felt compelled to dismiss the case. Judge Spitzer told them he called the watch commander the night before and was told Deputy Villalobos was on medical leave. The DDA told Judge Spitzer he felt it was unfair of the judge to dismiss the case without giving him an opportunity to explain that the deputy was on medical leave but still available to testify. At that point, according to the DDA, Judge Spitzer “kind of took a step back and responded that although he had made that call, that had not been the reason or played a role in the dismissal of the case.”
The next day, after receiving a call from Deputy Villalobos explaining why he failed to appear at the trial, the DDA went back to Judge Spitzer’s chambers to try to “salvage the deputy’s reputation.” During the conversation, Judge Spitzer indicated he felt the DDA had misunderstood what he said the day before. He explained the watch commander had called him for some other reason, and it occurred to him to ask about Deputy Villalobos’s availability.
*CJP Supp. 273 In his testimony before the special masters, Judge Spitzer denied initiating the phone call with the watch commander and stated the watch commander called him at home while he was the on-call magistrate.[6] We agree with the masters that this testimony is not credible. Both the DDA and Chief DDA Soccio testified Judge Spitzer told them the same day he dismissed the case that he called the watch commander. The judge’s recantation the next day to the DDA reflects a consciousness of the inappropriateness of his having initiated the communication. Judge Spitzer’s acknowledged suspicion that the witness was unavailable and concern that the trial was not proceeding in a timely manner provided motivation for him to make the call. We also agree with the masters that it is highly improbable, given the size of Riverside County, that Deputy Villalobos’s watch commander would happen to call Judge Spitzer for an order and, if he did, that Judge Spitzer would know the officer calling was Deputy Villalobos’s watch commander.
Judge Spitzer also denied that he considered his communication with the watch commander in making his decision to dismiss the matter. The masters rejected this testimony, as do we. When the DDA and the DDA supervisor asked why he dismissed the case, Judge Spitzer told them Deputy Villalobos was on medical leave.
2. Conclusions of Law
Judge Spitzer engaged in multiple instances of misconduct in this one case. As the masters concluded: “The initiation of the ex parte communication is the beginning of Judge Spitzer’s embroilment in this case. He considered the information to the advantage of the defense, without allowing the prosecution to address his concerns. He made an intemperate comment about Deputy Villalobos’s credibility. The comment showed a bias as to the officer’s credibility and an indication that he would communicate bias to other judges on the bench.” We conclude that Judge Spitzer engaged in willful misconduct by failing to promptly reveal the ex parte communication to the parties and by considering information obtained during the ex parte communication in his decision to dismiss the case. The judge’s public comments questioning the deputy’s credibility constitute prejudicial misconduct.
Judge Spitzer’s conduct related to the ex parte communication violated canons 1 and 2A (duty to uphold integrity of judiciary and avoid impropriety and appearance of impropriety), and 3B(7) (prohibiting ex parte communications). As such, the conduct was unjudicial under the three-prong Broadman test. He was also acting in a judicial capacity.
*CJP Supp. 274 Judge Spitzer contends that the bad faith element of willful misconduct is not satisfied because he was acting in a good faith, but misguided, attempt to move the trial along by determining the availability of a witness for scheduling purposes. Canon 3B(7) prohibits a judge from initiating, permitting or considering an ex parte communication outside the presence of the parties concerning a pending case. The canon provides an exception for ex parte communication intended for scheduling if the judge reasonably believes no party will gain an advantage as a result of the communication and the judge promptly notifies all parties of the substance of the communication. (Canon 3B(7)(d).) We agree with and adopt the masters’ conclusion that the ex parte communication did not fall within this exception.
As an experienced jurist, Judge Spitzer should have realized that determining the availability of a prosecution witness could give one side an advantage if a motion to continue or dismiss was made during the trial. However, even if Judge Spitzer did not believe any party would gain an advantage at the time he initiated the communication, he knew by the next day the information he obtained from the watch commander gave the defense an advantage in its motion to dismiss. Nevertheless, Judge Spitzer did not inform the parties of the communication before dismissing the case. His own explanation for failing to disclose establishes he acted in bad faith: “I was put in the Hobson’s [sic] choice kind of situation of . ..[][].. . now saying, ‘Well, should I tell the parties about this?’ If I inform the parties at that point in time, then I violate the Canon of Ethics which indicates that I shouldn’t engage or communicate things to the parties which would give an advantage, a tactical advantage to one side over the other. And so that’s the conduct that I would do differently.”
Thus, by his own admission, Judge Spitzer made a conscious decision not to reveal the ex parte communication to the parties for a purpose other than the faithful discharge of his duties—so the parties would not know he violated the canons. (See Broadman, supra, 18 Cal.4th at p. 1092.) Further, by considering an ex parte communication he knew was a violation of the canons in reaching a judicial decision, Judge Spitzer knowingly exceeded the bounds of his authority, and thus acted in bad faith. (See ibid.)
Judge Spitzer’s gratuitous public remarks demeaning the integrity of Deputy Villalobos and suggesting that his negative impression of the deputy would be shared with other judges constitute a serious violation of the judge’s duty to be patient, dignified and courteous (canon 3B(4)). Further, these comments reflect bias against a deputy who could appear in future cases. (Canon 3B(5) [judge to refrain from speech that could reasonably be perceived as bias or prejudice].) We agree with and adopt the masters’ conclusion that the judge’s strong statements about the deputy’s credibility *CJP Supp. 275 “are the polar opposites of promoting public confidence in the integrity and impartiality of the judiciary.” As such, the conduct violates canons 1 and 2A and constitutes prejudicial misconduct. (See Fletcher, supra, 19 Cal.4th at p. 899 [prejudicial misconduct when judge expressed prejudgment on the credibility of a potential witness who, according to the judge, had “ ‘broken many promises to this court’ ” and whose “ ‘credibility is not too high’ ”]; Dodds, supra, 12 Cal.4th at p. 176.)
E. Count VI—Ex Parte Communication and Embroilment (People v. Cobarruvias)
1. Findings of Fact
In March 2000, Judge Spitzer presided over the attempted murder trial in People v. Cobarruvias. During the trial, the defense attempted to call a police officer to testify about a statement made by the victim at the scene of the crime (an elementary school) that was inconsistent with the victim’s trial testimony. Because the victim spoke Spanish, the officer used Margaret Herrera, the school principal, as a translator. In order to admit the prior inconsistent statement, the defense first needed to establish through Ms. Herrera that she was competent to interpret and the statement was accurately translated. However, Ms. Herrera, who was not under subpoena, was reportedly out of the state. The prosecution had completed its case, and the trial was close to conclusion.
Judge Spitzer took it upon himself to call Ms. Herrera’s employer in an attempt to locate her. He did not consult with or inform either counsel or the defendant before making the call. Later the same day, the judge received a return call from Ms. Herrera. He spoke to her about her “observations” on the day she translated the victim’s statement and whether she was fluent in Spanish, prerequisite facts to the admissibility of her testimony.
The next day, Judge Spitzer informed both counsel of his conversation with Ms. Herrera, and announced he had arranged for an immediate conference call with her. He then proceeded to conduct a hearing in chambers on the admissibility of the victim’s prior inconsistent statement. Based on Ms. Herrera’s telephone testimony, Judge Spitzer ruled the prior inconsistent statement was admissible.
Judge Spitzer testified he called Ms. Herrera to expedite the trial, but acknowledged the conversation exceeded the topic of scheduling.
2. Conclusions of Law
Judge Spitzer’s conduct in this case violates canons 1 and 2A (duty to uphold integrity of judiciary and avoid impropriety and appearance of *CJP Supp. 276 impropriety), 3B(5) (judge to refrain from conduct that reasonably could be perceived as bias or prejudice), 3B(7) (prohibiting ex parte communications), and 3B(8) (duty to dispose of all judicial matters fairly). As the masters concluded, Judge Spitzer “abandoned his role as a neutral arbiter and became embroiled.” “Embroilment is the process by which the judge surrenders the role of impartial factfinder/decisionmaker, and joins the fray.” (Rothman, Cal. Jud. Conduct Handbook (3d ed. 2007) § 2.01, p. 37.) The judge’s embroilment manifested through his improper ex parte communication with Ms. Herrera constitutes prejudicial misconduct.
Even if Judge Spitzer called Ms. Herrera in a good faith attempt to expedite the trial, his actions were “ ' “prejudicial to public esteem for the judicial office.” ’ ” (Broadman, supra, 18 Cal.4th at p. 1104, quoting Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591].) “The subjective intent or motivation of the judge is not a significant factor in assessing whether prejudicial conduct has occurred . . . .” {Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544].) Judge Spitzer took on the role of the defense attorney by locating a defense witness and making arrangements for her testimony. Once again, Judge Spitzer improperly engaged in an ex parte communication that had the potential to benefit one side. (See, e.g., Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 631-632 [175 Cal.Rptr. 420, 630 P.2d 954] [prejudicial misconduct for judge to conduct an investigation into defense raised in unlawful detainer case]; Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 536-537 [247 Cal.Rptr. 378, 754 P.2d 724] (Ryanf Fletcher, supra, 19 Cal.4th at pp. 898-899.) By so doing, he crossed the line between a neutral arbitrator and an advocate.
F. Count VII—Ex Parte Communication and Embroilment (People v. Carr)
1. Findings of Fact
While presiding over the jury trial in People v. Carr in May 2004, Judge Spitzer engaged in his third and most egregious course of conduct involving embroilment and ex parte communications. The defendant was charged with the murder of a child stemming from a driving under the influence automobile accident. During a discussion with counsel concerning jury instructions, the judge urged the DDA to charge gross vehicular manslaughter as an alternative to murder. When the DDA declined, Judge Spitzer questioned the DDA’s qualifications and requested that he speak with his supervisor to determine whether “the district attorney’s office is not seeking to amend” the murder charge to add an alternative charge of gross vehicular manslaughter. *CJP Supp. 277 Judge Spitzer then requested a meeting with the DDA’s supervisor. As a result, Chief DDA Cregor Datig appeared in front of Judge Spitzer that afternoon to explain his office’s filing decision.
After the jury deadlocked 11 to one in favor of guilt on the murder charge and convicted the defendant of lesser offenses, Judge Spitzer addressed several members of the decedent’s family who were present in the courtroom. He told them the case should be settled with a plea to vehicular manslaughter and even suggested he would dismiss the murder charge if a second jury did not reach a verdict.
The decedent’s mother, Kathleen Kavanagh, arrived with her five-year-old son and 16-year-old daughter after court had recessed. Judge Spitzer saw her in the hallway and directed her into his office to talk. The office door was closed, with Ms. Kavanagh’s children left in the hallway. According to Judge Spitzer, he only informed Ms. Kavanagh of what he had stated in open court earlier. However, contrary to Judge Spitzer’s testimony, the record amply supports the masters’ finding that “the judge’s comments to Ms. Kavanagh went beyond what he said in open court.” He read her sections of the Penal Code, explained the difference between second degree murder and manslaughter, and told her it would be difficult for the prosecution to prove murder. According to Ms. Kavanagh, Judge Spitzer said words to the effect of “Look, basically the charge should have never been murder in any degree; [i]t was a crime that should only have held a manslaughter charge. . . . Mr. Carr did not intentionally plan to kill your son, with all due respect, Ms. Kavanagh, for you and your son it was an accident.” Judge Spitzer also told Ms. Kavanagh the defendant faced a “substantial amount of time” if convicted of manslaughter. Ms. Kavanagh replied: “Well, my son isn’t never getting to come home; so why should he [the defendant] ever get to come home?”
Judge Spitzer also suggested Ms. Kavanagh should try to influence the DDA to charge the defendant with manslaughter so there would not have to be a second trial. He warned he would have to dismiss the murder charge if the second jury did not reach a verdict. Ms. Kavanagh testified he said words to the effect of “This is my house; and when you get your house, you can do things your way. And this is my house, and we’re going to do things my way.”[7] As a result of these and other comments, Ms. Kavanagh felt very intimidated by Judge Spitzer.
Judge Spitzer admitted his comments to Ms. Kavanagh gave the appearance he was trying to influence her to consent to a reduction of the murder *CJP Supp. 278 charge to manslaughter, but denied that was his intention. The masters rejected the judge’s testimony that his only intention was to “comfort” Ms. Kavanagh and provide her with the same information he had given those who appeared in court that day. We similarly reject this claim which the judge repeated at his oral argument before the commission. The testimony of Ms. Kavanagh clearly and convincingly proves that Judge Spitzer attempted to enlist her in his efforts to convince the district attorney’s office to agree to a manslaughter disposition.
At a subsequent court appearance, Judge Spitzer continued to pressure the DDA for a manslaughter disposition. He told the DDA and defense attorney he had a conversation with Ms. Kavanagh and his impression was she was “not hostile” to a manslaughter plea bargain.
During a trial readiness conference the following week, after the defendant rejected an offer to plead guilty to manslaughter with a 44-year sentence, Judge Spitzer called Chief DDA Datig. Judge Spitzer inquired whether there was the possibility of further negotiations. He also told Mr. Datig he had talked to Ms. Kavanagh who was not opposed to a manslaughter plea. Mr. Datig informed the judge that further negotiation would not occur.
Judge Spitzer was disqualified from presiding over the second trial in the case. The district attorney’s office subsequently disqualified him from all felony cases for a period of time.
The defendant was convicted of second degree murder at a second trial before a different judge.
2. Legal Conclusions
The masters and we conclude that Judge Spitzer engaged in willful misconduct when “he met with Kathleen Kavanagh outside the presence of the parties, attempted to persuade her to acquiesce in a manslaughter disposition, and attempted to enlist her in his efforts to persuade the DA’s office to drop the murder charge and charge the defendant with vehicular manslaughter.” His willful misconduct also included pressuring the district attorney’s office to amend the charges and his public statement in court attempting to persuade the decedent’s family to agree to a manslaughter disposition. This conduct was unjudicial, the first element of willful misconduct, in that it violated canons 1, 2A (duty to uphold integrity of judiciary and avoid appearance of impropriety), 3B(5) (duty to perform judicial duties without bias or prejudice), 3B(7) (prohibiting ex parte communications), and 3B(8) (duty to dispose of all judicial matters fairly). The prohibition against ex parte communications concerning pending or impending cases applies to Judge *CJP Supp. 279 Spitzer’s conversation with Ms. Kavanagh because she was a potential witness at the retrial. In addition, it was improper for Judge Spitzer to enlist Ms. Kavanagh as his agent in communicating his desire to have the case resolved with a manslaughter plea, since canon 3B(7) prohibited ex parte communication with the prosecutor.
Judge Spitzer acted in bad faith, the second element of willful misconduct. He acted for a purpose other than the faithful discharge of his judicial duties (Broadman, supra, 18 Cal.4th at p. 1092); he was improperly attempting to intrude on the functions of another branch of government. In Ryan, supra, 45 Cal.3d at pages 535-536, the Supreme Court determined the judge engaged in willful misconduct when, after conducting a preliminary hearing, he called the district attorney ex parte and urged him to pursue the matter as a felony.[8] (See also Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 369 [188 Cal.Rptr. 880, 657 P.2d 372].)
We agree with the masters’ conclusion that, as he had in the previous two counts, Judge Spitzer once again “abandoned his role as a neutral arbiter and became embroiled in the case.” Judge Spitzer disputes this and maintains he was acting in good faith for the purpose of providing Ms. Kavanagh with comfort and clarification of the legal issues. However, as previously discussed, like the masters we have rejected the judge’s testimony in this regard. In his testimony before the special masters, Judge Spitzer concurred with the conclusion of the judge who ruled on the motion to disqualify him from the retrial that “Judge Spitzer took unusual steps to try to influence the office of the District Attorney to exercise his discretion to prosecute this defendant for manslaughter,” and later “to try to influence the District Attorney to offer the defendant an acceptable plea bargain for manslaughter.”
Far from perceiving Judge Spitzer’s comments as comforting, Ms. Kavanagh testified that she “took it as he was intimidating me.” Attempting to convince a mother whose child was killed by a drunk driver that her child’s death was unintentional by reference to Penal Codes, legal terminology, and sentence calculations reflects an alarming lack of sensitivity in addition to being extraordinarily inappropriate and unjudicial.
*CJP Supp. 280 We reject Judge Spitzer’s argument that his conduct cannot be considered willful misconduct because he was not acting in a judicial capacity. “Judicial capacity” within the definition of willful misconduct is not limited to actions taken from the bench. (See Ryan, supra, 45 Cal.3d at pp. 535-536.) A judge acts in a “judicial capacity” when the judge is “performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses ... the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds, supra, 12 Cal.4th at p. 172.)
The facts of two cases cited by Judge Spitzer in which the Supreme Court held the judge was not acting in a judicial capacity are not analogous to the facts of this case. In Dodds, the misconduct did not relate to a case pending before the judge. {Dodds, supra, 12 Cal.4th at pp. 170-171, 175-176 [judge failed to report a fellow judge he saw deflating a tire in the court parking lot and suggested to court staff they delay making a statement to the authorities].) In Broadman, the judge made comments on a pending case in the course of a press interview. In contrast, Judge Spitzer made statements to a person involved in a case pending before him and used the authority of his judicial office in an attempt to influence the district attorney’s office. As such, he was clearly acting in a judicial capacity.
We conclude Judge Spitzer engaged in a course of conduct constituting willful misconduct.
G. Count VIII—Failure to Cooperate with the Commission
1. Findings of Fact
In this final count, Judge Spitzer is charged with failing to cooperate with the commission during its preliminary investigation of these proceedings. On July 14, 2005, the commission sent Judge Spitzer a preliminary investigation letter, requesting a response to the allegations set forth in the letter. Through counsel, the judge made three requests for extensions of time to respond. The final extension was granted until November 8, 2005, at which time there was no response from the judge. On January 18, 2006, Judge Spitzer, who was no longer represented by counsel, faxed a letter to the commission indicating he was waiting for transcripts and would endeavor to respond within the next two weeks. Judge Spitzer never responded to the allegations in the preliminary investigation letter.
2. Conclusions of Law
Government Code section 68725 requires judges to “co-operate with and give reasonable assistance and information” to the commission in *CJP Supp. 281 connection with its investigations. The masters concluded, as do we, that Judge Spitzer violated this legal requirement and, in so doing, violated canons 1 and 2A and engaged in prejudicial misconduct. (Doan, supra, 11 Cal.4th at pp. 337-338 [prejudicial misconduct when judge asked two friends not to cooperate with commission investigators and refused to cooperate with, or give assistance to the commission during its preliminary investigation].)
Judge Spitzer urges the commission to find his conduct to be improper action rather than prejudicial misconduct. He contends his lack of response is attributable to his failure to appropriately prioritize his required work, rather than a willful disregard of his responsibilities. Prejudicial misconduct does not require that the judge act in bad faith; rather, it is conduct which would appear to an objective observer to be prejudicial to public esteem for the judiciary. (Broadman, supra, 18 Cal.4th at p. 1092.) The public expects judges to comply with the law. Judge Spitzer was aware of his legal obligation to cooperate with the commission. His explanation for failing to do so, that he placed priority on his caseload, is belied by his persistent failure to attend to his judicial obligations as reflected in the misconduct before us.
We recognize that Judge Spitzer was caring for his ill mother in September and October; however, his response was requested in July and the commission provided him with three extensions of time. Moreover, as the masters found, he never requested time off from his judicial responsibilities to prepare a response.
Judge Spitzer’s failure to cooperate with the commission, when combined with the delays and failure to take action in counts I through IV, constitutes a persistent failure to perform judicial duties. {Doan, supra, 11 Cal.4th at p. 312.)
HI.
DISCIPLINE
A. Introduction
In determining the appropriate level of discipline, our “ultimate objective is to protect the judicial system and the public which it serves from judges who are unfit to hold office.” (McComb v. Commission on Judicial Performance (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9 [138 Cal.Rptr. 459, 564 P.2d 1]; see Doan, supra, 11 Cal.4th at p. 314.) The purpose of a commission disciplinary proceeding “ ‘is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial *CJP Supp. 282 conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman, supra, 18 Cal.4th at pp. 1111-1112, quoting Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at p. 912.) After careful consideration, we have concluded that these objectives can only be met through removal from office. As we explain below, Judge Spitzer has engaged in a course of conduct which seriously undermines public confidence in the fair and competent administration of justice and demonstrates a lack of ability and temperament to perform judicial functions. We are left with no confidence in his ability to refrain from future misconduct.
B. Analysis
In our analysis, we address those factors which we have previously considered relevant when determining what discipline is appropriate in a given case. (Inquiry Concerning Ross (2005) No. 174, Decision and Order Removing Judge Ross from Office, pp. 63-64 [49 Cal.4th CJP Supp. 79, 137-138]; Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge Van Voorhis from Office, p. 31 [48 Cal.4th CJP Supp. 257, 295].) Within our discussion of these standards, we also address factors in aggravation and mitigation listed in the masters’ report.
1. Number of Acts of Misconduct
The number of acts of misconduct is relevant to discipline to the extent it shows isolated incidents, or a pattern of misbehavior that demonstrates the judge lacks judicial temperament and the “ ‘ “ability to perform judicial functions in an even-handed manner.” ’ ” (Fletcher, supra, 19 Cal.4th at p. 918 [pervasiveness of misconduct over the judge’s entire career demonstrated unfitness for office].) Judge Spitzer has engaged in numerous instances of willful and prejudicial misconduct over a period of 10 years. The misconduct involves dereliction of judicial duties, embroilment, ex parte communications, and executing at least 70 false salary affidavits, some of which were signed with utter disregard for the truth. This pattern of repeated wrongdoing leaves us with no doubt that Judge Spitzer lacks the temperament and ability to perform judicial functions with the competence, temperament, and impartiality expected of the judiciary.
2. Appreciation of Misconduct
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge Platt from Office, p. 15 [48 Cal.4th CJP Supp. 227, 248]; see Inquiry Concerning Ross, supra, No. 174 *CJP Supp. 283 at p. 65 [49 Cal.4th CJP Supp. at p. 139].) In his testimony before the special masters and at his oral argument before the commission, Judge Spitzer repeatedly avoided taking full responsibility for his actions.
Judge Spitzer blamed his persistent delays and failure to decide matters on the overburdened courts, and, in some instances, on court staff. The Riverside County Superior Court is clearly overburdened. However, by the judge’s own account, he had no more cases than other judges in the county. Judge Spitzer also suggests that he is more backlogged than other judges because he presides over more trials, and therefore did not have time to handle submitted matters and administrative tasks. We do not disagree with the masters and the character witnesses who testified that Judge Spitzer is a hard-working judge. However, as one of the special masters suggested, it appears that “to some degree, [he was] . . . escaping to trial” where he was most comfortable as a judge. We concur with the masters that Judge Spitzer’s failure to give his other judicial responsibilities his prompt attention “added insult to existing disadvantage and did nothing to improve public confidence in an increasingly inaccessible system of civil justice.” In the words of a fellow judge and former presiding judge, “Judge Spitzer was in a state of denial for a long time that he wasn’t able to control his caseload.”
In his testimony before the special masters, Judge Spitzer suggested that his clerk let signed orders sit unprocessed on her desk for significant periods of time, a claim refuted by his clerk. In his oral presentation before the commission, Judge Spitzer implied that court staff shared responsibility for his delays and missing documents because they refused to come into his cluttered chambers and because they failed to locate files and documents he had misplaced. He also blamed staff for failing to bring inquiries about cases to his attention, a claim contradicted by the testimony of court staff. We emphatically reject any implication that staff were at fault—Judge Spitzer, not his staff, was responsible for his misconduct.
Judge Spitzer attempted to deflect responsibility for his six-year delay in deciding the McGuire (count II A) small claims case by testifying he had decided the matter but simply failed to sign the order, a claim we and the masters have rejected. He also took the position that he was not responsible for deciding matters under submission after he was transferred to a criminal assignment, despite receiving e-mails from his presiding judge informing him he was still responsible for civil matters under submission.
At the hearing before the special masters and in his oral presentation to the commission, Judge Spitzer portrayed his failure to perform judicial duties, including his failure to cooperate with the commission, as being the result of his diligence in focusing on cases currently before him. We find *CJP Supp. 284 Judge Spitzer’s conduct demonstrates an inability to properly attend to and prioritize his judicial obligations. Faithful discharge of judicial responsibilities requires the ability to multitask. In addition to handling the cases that come before them, judges are expected to diligently discharge their administrative responsibilities and to “cooperate with other judges and court officials in the administration of court business.” (Canon 3C(1); see also canon 3B [adjudicative responsibilities]; Rothman, Cal. Jud. Conduct Handbook, supra, § 6.10, p. 262.)
Judge Spitzer also engaged in denials regarding his misconduct in the criminal cases. He insisted that he was attempting to comfort Ms. Kavanagh and denied attempting to influence her to consent to a reduction of the murder charge despite overwhelming evidence to the contrary. He persisted in his refusal to accept responsibility for the full extent of his misconduct in his oral argument before the commission where he stated: “I thought that I was communicating well with Kathleen Cavanaugh [szc] saying exactly to her what I had said in open court.”
Judge Spitzer denied initiating the ex parte communication with the watch commander in People v. Johnson (count V). In response to the charges in count VI (People v. Cobarruvias), he testified that he still does not see “anything particularly wrong” about contacting Ms. Herrera and discussing the facts of the case with her.
Significantly, Judge Spitzer expressed little recognition or understanding of the impact his misconduct had on the litigants in the criminal or civil cases. Furthermore, his failure to respond to the commission’s investigation reflects a lack of appreciation for the seriousness of the charges.
3. Likelihood of Future Misconduct
The likelihood of future misconduct is a key factor in our decision to remove Judge Spitzer from judicial office. The masters accepted Judge Spitzer’s assurance that he has taken steps to ensure timely performance of his judicial duties, including therapy and making procedural changes in his courtroom. We are not similarly persuaded by the judge’s assurances. Judge Spitzer made similar representations in the past, which have subsequently proven to be hollow.
In 2003, the commission issued a notice of intended public admonishment based on Judge Spitzer’s failure to timely decide matters in three cases and executing at least one false salary affidavit. The matter was closed without discipline after the judge made an appearance before the commission on December 11, 2003. (Rules of Com. on Jud. Performance, rule 116(b).) At the *CJP Supp. 285 appearance, Judge Spitzer assured the commission that he had no cases under submission for more than 90 days, that the problem had not reoccurred since February or March of that year, and that he had set up procedures to “avoid a repetition of this problem.” In fact, the evidence in this case establishes that these assurances were false. At the time of his appearance, the Lindsay matter (count II C) which was submitted in May 2003 remained undecided and the proposed case management order in the Robinson matter (count III A) submitted by the parties in April 2003 remained unsigned. The judge’s representation that he had changed his practices to avoid delay is refuted by his conduct in SCAG (count I B) and CC1 (count I C). Judge Spitzer had the unprocessed judgment in SCAG, signed July 2003, with him when he came to the commission meeting in San Francisco. Nevertheless, he took no steps to have it processed when he returned to his court. In CCI, he signed the order just 20 days after his appearance before the commission, but had no procedures in place to ensure it was timely processed.
When Judge Spitzer was transferred to a civil assignment in 2001, he told Judge Tranbarger that he had a plan to deal with his organizational problems—he would not bring court papers into his chambers. The evidence amply demonstrates that he did not follow through with that plan.
By Judge Spitzer’s own account, it would be imprudent to assign him to a civil department because “it would be difficult for me to do the work that’s associated with doing justice in a civil courtroom.” When asked whether he would give more attention to submitted matters and administrative tasks if returned to civil, Judge Spitzer responded that he did not think his priorities would change. These statements are tantamount to an admission that further misconduct would occur if he were assigned to civil in the future. His long history of disorganization, pervasive pattern of dysfunctional practices resulting in delays and inaction, and failure to appreciate the seriousness or consequences of his misconduct leave us with no doubt that similar misconduct would reoccur if he was assigned to a civil department.
Even the initiation of a preliminary investigation in these proceedings did not spur Judge Spitzer to change his practices. Instead, consistent with his pervasive pattern of failure to attend to his judicial duties, he ignored his duty to cooperate with the commission.
There is also a strong likelihood of future misconduct in a criminal assignment. Judge Spitzer engaged in similar misconduct involving embroilment and ex parte communications in three criminal cases. These cases reflect Judge Spitzer’s inability or unwillingness to act within appropriate judicial boundaries. The most egregious misconduct, in People v. Carr, occurred just months after his appearance before the commission in 2003 and after he had *CJP Supp. 286 been disqualified by the district attorney’s office from hearing other criminal cases, in part, because of his past embroilment. We have no confidence in his ability to conform to standards of judicial conduct.
4. Integrity and Honesty
Judge Spitzer’s integrity is called into question by his conduct in executing salary affidavits with reckless disregard for the truth and by his lack of candor in these proceedings. Honesty is a minimum qualification for every judge. (Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239]; Inquiry Concerning Ross, supra, No. 174 at p. 68 [49 Cal.4th CJP Supp. at p. 141].) Based on the testimony of Riverside County judges and lawyers, the masters found that Judge Spitzer has a reputation as a knowledgeable and honest judge. We do not question Judge Spitzer’s intelligence or knowledge of the law. Nor do we doubt that his character witnesses believe Judge Spitzer to be a man of integrity, albeit with organizational issues. Nevertheless, the record in these proceedings reflects a lack of candor incompatible with the role of a judge. “If the essential quality of veracity is lacking, other positive qualities of the person cannot redeem or compensate for the missing fundamental.” (Inquiry Concerning Hall (2006) No. 175, Decision and Order Removing Judge Hall from Office at p. 26 [49 Cal.4th CJP Supp. 146, 171].)
On numerous occasions, Judge Spitzer was deceptive in his testimony before the masters and in his oral presentation to the commission. He falsely denied calling the watch commander and considering the ex parte communication in his decision to dismiss the Johnson case (count V). In the Carr matter (count VII), he attempted to mislead the masters and the commission by claiming that he was only trying to comfort Ms. Kavanagh and was not trying to influence her or the district attorney to agree to a manslaughter disposition. In the McGuire matter (count II A), he falsely testified that he made a decision shortly after the first trial, where the evidence established that he delayed rendering a decision for six years. Judge Spitzer also engaged in disingenuous attempts to explain his delays and failure to cooperate with the commission as being the result of his conscientious dedication to the cases at hand and the shortcomings of his staff.
Judge Spitzer testified that he requested a transfer to a civil assignment in 2001 because he wanted a change. However, according to his former presiding judge, Judge Spitzer was transferred to civil because “his [criminal] caseload was virtually nonexistent” as a result of having been disqualified from criminal cases by the district attorney’s office, and Judge Spitzer was not pleased with the transfer.
*CJP Supp. 287 The Supreme Court strongly denounced a judge who made material misstatements to the commission in Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at page 914, stating: “There are few judicial actions in our view that provide greater justification for removal from office than the action of a judge in deliberately providing false information to the Commission in the course of its investigation into charges of wilful misconduct on the part of the judge.” (Ibid.; accord, Fletcher, supra, 19 Cal.4th at pp. 887-891.) Additionally, we are troubled by Judge Spitzer’s willingness to impugn the credibility of two district attorneys and Ms. Kavanagh by implying they falsely testified concerning material facts in these proceedings.
The lack of candor we have observed in these proceedings is fundamentally at odds with the role of a judge who is sworn to uphold the law.
5. Prior Discipline
Judge Spitzer has not previously been disciplined. Nevertheless, the pattern of willful and prejudicial misconduct and persistent failure to perform judicial duties in this case spanning a period of 10 years overshadows his lack of prior discipline.
6. Impact on the Judicial System
The impact of Judge Spitzer’s misconduct and persistent failure to perform his judicial duties has been significant. A pattern of misconduct consisting of delays, indecision, signing false salary affidavits, ex parte communication, embroilment, and failure to cooperate with his presiding judge and the commission inevitably lowers public esteem for the judiciary.
Judge Spitzer’s indifference toward his obligation to promptly and efficiently decide matters had an adverse impact on the litigants who appeared before him and his fellow judges. As the masters recognized, “[w]ith severely overcrowded court dockets, a failure to make timely decisions on these motions exacerbates frustrations felt by civil parties regarding limited trial opportunities.” Other judges had to take over his calendar when his presiding judge was forced to relieve him from his assignments so he could get caught up on his cases. Likewise, his fellow judges had to handle his routine matters when he was unable to keep up with them.
A judge who is not competent to handle a civil calendar and who has a history of embroilment which at various times has resulted in his being disqualified from hearing criminal cases does not serve the public and cannot remain on the bench.
*CJP Supp. 288 ORDER REMOVING JUDGE SPITZER FROM OFFICE
Pursuant to the provisions of article VI, section 18 of the California Constitution, Judge Robert G. Spitzer is ordered removed from his judicial office; pursuant to that section of the Constitution and rules 120(a) and 136 of the Rules of the Commission on Judicial Performance, Judge Spitzer is hereby disqualified from acting as a judge.
Commission members Hon. Frederick P. Horn, Hon. Judith D. McConnell, Hon. Katherine Feinstein, Mr. Peter E. Flores, Jr., Mr. Marshall B. Grossman, Ms. Patricia Miller, Ms. Barbara Schraeger, Mr. Lawrence Simi, and Ms. Maya Dillard Smith voted in favor of all of the findings and conclusions expressed herein and in the forgoing order of removal and disqualification of Judge Spitzer. Commission member Mr. Samuel A. Hardage did not participate. There is one vacancy on the commission.
The judge’s petition for review by the Supreme Court was denied on March 19, 2008.

 Justice Miller has since been appointed to the California Court of Appeal, Fourth Appellate District, Division Two.

 Judge Spitzer testified that there were occasions over the years when he did not sign salary affidavits because he knew he had matters under submission for more than 90 days. He was not specific as to which months or cases he was referring to and did not testify that he refrained from executing salary affidavits as a result of his delays in any of the cases charged in this count.

 The term “delayed matters” refers to matters that were under submission to Judge Spitzer but undecided for more than 90 days.

 The false salary affidavits in this case are the same as those signed during part of the delay period in the Lindsay matter (count II C). Fewer false salary affidavits were executed in this case because the delay period was shorter than in the Lindsay matter.

 Twelve erroneous salary affidavits were executed between August 2005 and July 2006.

 No evidence was admitted confirming or refuting that Judge Spitzer was an on-call magistrate that night.

 Although the masters did not include this testimony in their report, we find Judge Spitzer made a remark to this effect. The masters’ findings and conclusions in this count manifest they found Ms. Kavanagh to be a credible witness, as do we.

 Judge Spitzer contends the commission did not find willful misconduct under similar factual circumstances in the public admonishments of Judge Susanne Shaw (Inquiry Concerning Shaw (2000) No. 156, Decision and Order Imposing Public Admonishment [48 Cal.4h CJP Supp. 125]), Judge Bruce Clayton Mills (2006), and Judge Ronald Maciel (1997). In the Mills and Maciel matters the commission did not address whether the judge’s improper ex parte communications were willful or prejudicial misconduct. In Shaw, the commission adopted the masters’ conclusion that the judge engaged in prejudicial misconduct when she told the DDA not to undercut the 30-day offer she made to a misdemeanor defendant. Each case turns on its own facts, and the facts in Shaw do not present the same degree of embroilment and improper conduct that is present in this case.